**LINK, Appellant,**

v.

**LEADWORKS CORPORATION et al., Appellees.**

[Cite as *Link v. Leadworks Corp.* (1992), 79 Ohio App.3d 735.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 60300.

Decided May 4, 1992.

*Dworken & Bernstein Co., L.P.A.,* and *Patrick J. Perotti,* for appellant.

*Kohrman, Jackson & Krantz* and *Jonathon M. Yarger,* for appellees.

NAHRA, Judge.

Plaintiff-appellant Martin P. Link appeals the trial court's grant of partial summary judgment in favor of defendants-appellees, Leadworks Corporation, Les Wagenheim, and Xonex International, Inc.

In early 1988, Martin Link, domiciled at such time in New Jersey, answered an advertisement placed by Leadworks in the *New York Times*. Leadworks was a Solon, Ohio corporation of which Les Wagenheim was the president and chairman of the board of directors. After a brief telephone conversation, Wagenheim invited Link to Cleveland and the two met on March 2, 1988. During their meeting, Wagenheim solicited Link to relocate to Cleveland and join Leadworks as its national marketing coordinator. In his deposition, Link reveals that Wagenheim made numerous statements of fact about Leadworks during their meeting. Link asserts that Wagenheim told him that Leadworks was growing in leaps and bounds, that it had $12,000,000 in annual sales volume, which was increasing to $20,000,000, and that the business had a thirty to fifty percent increase in sales for 1988 over 1987. Moreover, Link stated that Wagenheim told him that the sales force was growing and that it covered the entire United States. Wagenheim invited Link to join and grow with the company. Dianne Sitar, another employee hired by Leadworks at about the same time, asserted in her affidavit that Wagenheim made similar representations to her about Leadworks.

Wagenheim and Link also discussed Link's compensation; Wagenheim promised Link an annual salary, moving expenses, commissions, and additional bonuses known as "overrides."

In a letter dated March 3, 1988, Wagenheim wrote Link and offered Link a job with Leadworks. Link accepted the offer of employment from Leadworks in a letter dated March 10, 1988. Link moved to Cleveland and commenced work at Leadworks on March 28, 1988.

On March 29, 1988, Leadworks held a meeting directed by Moses Lisbonne, the executive vice-president, and announced that all employees were partially laid off as of that day due to "temporary financial difficulties." Link and others were told that they would receive only one half of their salaries. Link objected to the layoff and was told that Wagenheim would take care of it upon his return from abroad. Employees were asked to work alternate weeks during the month of April 1988, and to collect unemployment compensation during their time off. Link continued to work full-time. On April 19 or 20, 1988, Link met with Wagenheim to discuss the layoff. Wagenheim revealed to him that there was nothing to be concerned about and that all was well and that Link's salary deficiency would be paid in full sometime soon. As a result

of such conversation, Link stated that he continued to work at Leadworks full-time.

Link's salary was cut again less than three weeks later. Link confronted Wagenheim, who reassured Link that the problem was a temporary one, and that Link would soon be repaid in full. However, Leadworks was suffering significant losses at the time of over $55,000 per month in April and May 1988. Wagenheim also revealed that the company had suffered over $200,000 of losses as a year-to-date figure at the time Link was hired in early March 1988.

In his deposition, Wagenheim stated that he was not aware of the cash flow problems of Leadworks when he met with Link or that it would be necessary to lay off people at a later time. He also conveyed that he was shocked by the acute cash flow shortage that emerged in late March 1988.

During Link's employment at Leadworks, he discovered initially that there were no in-house sales people at all. Instead, the entire sales force consisted of ten to fifteen independent, nonexclusive representatives. Most of these sales people, according to Link, were not working because they had not been paid commissions by Leadworks.

On September 28, 1989, Wagenheim fired Link because Wagenheim was unable to pay him.[1] At such time, Link was not paid his full wages and commissions to which he was entitled.

Eventually, Leadworks was unable to survive as a corporate entity. Many of Leadworks' assets were taken by its secured creditors, Marine Midland Bank and National City Bank. However, the day after Leadworks terminated operations, Xonex, Inc. was opened by Wagenheim with the same phone number, location, and core of employees. While many of Leadworks' assets were taken by its secured creditors, documentation appended to Link's motion in opposition to summary judgment indicates that other assets of Leadworks were used by Xonex. Evidence indicates that sample cases, catalogue/insert cards, packing boxes, and crates of Leadworks were transferred to Xonex and discovered in its warehouse. Certain blank checks from Leadworks' account bearing Wagenheim's signature were written to "cash" and Leadworks paid some of Xonex's bills. Steven Silfen, a former Leadworks' employee, revealed that he saw products identical to those of Leadworks under the name of Xonex at a New York trade show. Link's evidentiary documents provided that Wagenheim used a cellular car phone and a radar detector from Leadworks without any apparent payment to Leadworks for such items.

---

1. Wagenheim acknowledged Link's competent execution of his duties in a letter.

Link also submitted evidentiary materials suggesting that Wagenheim used Leadworks' corporate funds for his personal use while he was the chairman of Leadworks. Documents were submitted that Wagenheim paid his two daughters' salaries even though one daughter did not work for the company. Documents reveal that Wagenheim used Leadworks' funds to make his daughters' car payments, to pay his personal homeowner's insurance, to pay personal utilities, to purchase a personal vacation condominium, and a variety of other personal expenditures. Wagenheim submitted the tax return of himself and his wife to indicate that all of his expenditures were proper.

In March 1989, Link filed a complaint against Leadworks to recover damages for unpaid wages, bonuses and commissions resulting from his employment with Leadworks. Subsequently, Link filed an amended complaint that joined Wagenheim as a new-party defendant. Link added counts five and six to the original complaint and alleged that Leadworks was a sham corporation and/or the alter ego of Wagenheim, that Wagenheim should be held personally liable for the corporate debts, and that Wagenheim committed fraud with respect to Link by personally misstating material facts about Leadworks and its financial condition at the time Leadworks entered into the employment contract with Link, and by entering into such contract when Wagenheim knew Leadworks was unable to meet its obligations.

Upon discovery that Wagenheim had closed down Leadworks and opened Xonex, Inc. the next day, Link filed an amended complaint in which he added counts seven, eight, and nine. Link alleged that Xonex, Inc., as Leadworks' successor, was liable for Leadworks' debt, that Xonex was the recipient of fraudulent conveyances designed to strip Leadworks and/or Wagenheim of assets, and that Xonex is the alter ego of Wagenheim or Leadworks.

In May 1990, Wagenheim and Xonex filed a joint motion for partial summary judgment with respect to counts five through nine. Link filed a brief in opposition to summary judgment as well as a reply brief. In addition, Link filed a Civ.R. 56(E) motion to strike certain tax returns which Wagenheim had appended to his motion and which Link claimed were unsworn and uncertified. Without ruling on Link's motion to strike, the trial court granted appellees' motion for summary judgment.[2] This timely appeal follows.

## I

Appellant's first assignment of error states:

---

**2.** The parties have stipulated that they entered into a settlement with respect to the first four counts of plaintiff's complaint. As a result, such causes of action are not the subject of this appeal.

"The trial court erred in granting summary judgment to the defendants on the successor liability claim (Count 7) where defendants' motion did not seek summary judgment on this claim."

Summary judgment will be rendered in a case where "there is no genuine issue as to any material fact and * * * the moving party is entitled to judgment as a matter of law." Civ.R. 56(C). A court must look to the parties' pleadings to determine the issues and to see if any written admissions were made. The court then turns to the documentary evidence to determine whether a genuine issue of material fact exists. A genuine issue of material fact exists when the relevant factual allegations contained in the documentary evidence attached to a summary judgment motion and opposition brief are in conflict. *Duke v. Sanymetal Co.* (1972), 31 Ohio App.2d 78, 60 O.O.2d 171, 286 N.E.2d 324. Summary judgment is appropriate when reasonable minds can come to but one conclusion after reviewing the evidence and that conclusion is adverse to the nonmoving party. Civ.R. 56(C).

On appeal, the reviewing court evaluates the record from a summary judgment proceeding in a light most favorable to the nonmoving party. *Williams v. First United Church of Christ* (1974), 37 Ohio St.2d 150, 66 O.O.2d 311, 309 N.E.2d 924. The inferences to be drawn from the underlying facts contained in depositions, affidavits, and exhibits must be construed in the opposing party's favor. When construed this way, the motion must be overruled if reasonable minds could find for the party opposing the motion. *Hounshell v. Am. States Ins. Co.* (1981), 67 Ohio St.2d 427, 433, 21 O.O.3d 267, 271, 424 N.E.2d 311, 314.

Link maintains that the trial court erred by entering summary judgment in favor of Wagenheim and Xonex on Link's allegation of successor liability.

It is well settled that when one corporation sells or otherwise transfers its assets to another corporation, the transferee corporation is not liable for the debts and liabilities of the transferor, unless (1) the transferee expressly or impliedly agrees to assume the transferor's debts and obligations; (2) the transaction is merely a consolidation or merger; (3) the transaction is fraudulent in fact; or (4) the transferee is merely a continuation of the transferor. *Cattron, Inc. v. Overhead Crane & Hoist, Inc.* (1987), 32 Ohio App.3d 80, 81, 513 N.E.2d 1390, 1391; see *Green v. U.S.A. Energy Consultants* (Sept. 29, 1986), Cuyahoga App. Nos. 50942 and 51149, unreported, 1986 WL 11053.

Reviewing the evidentiary materials before us, we believe that there is a genuine issue of material fact whether Xonex is merely a continuation of Leadworks. Xonex was opened by Wagenheim on the day after Leadworks' close, at the same location, and with the same core of employees as Lead-

works. In his deposition, Wagenheim revealed that he closed Leadworks and opened Xonex to purposefully avoid the claims of creditors. Evidence also indicated that the line of products sold by Xonex was similar to that sold by Leadworks; Xonex also apparently used some of Leadworks' assets.

At the same time, Wagenheim provided documentation that Xonex was incorporated as an entirely separate corporate entity and that its board members were different from those of Leadworks. Wagenheim also asserted that Leadworks' secured creditors claimed the corporation's assets and that any of Leadworks' valuable assets that Xonex possessed had been purchased at fair market value from such secured creditors.

We find that on the basis of facts presented in the pleadings, exhibits, depositions, and answers to interrogatories, there is a genuine issue of material fact with respect to Xonex's liability on the theory of successor liability.

Appellant's assignment of error is sustained.

## II

Appellant's second assignment of error states:

"The trial court erred in granting summary judgment on the fraud claims (Count 6)."

In order to establish a claim for fraud, the following elements must be proved:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709, 712, citing *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

The general rule is that fraud cannot be predicated upon a representation concerning a future event. *Tibbs v. Natl. Home Constr. Corp.* (1977), 52 Ohio App.2d 281, 6 O.O.3d 300, 369 N.E.2d 1218. Mere predictions about the future, expectations, or opinions are not fraudulent misrepresentations unless those opinions are fraudulently made. *Davish v. Arn* (App.1940), 32 Ohio Law Abs. 646. However, a promise made with a present intention not to perform it is a misrepresentation of an existing fact—the speaker's present state of mind. If such a false representation induces the other party to enter

into a contract, the contract may be voided. *Monaghan v. Rietzhe* (1950), 85 Ohio App. 497, 40 O.O. 384, 89 N.E.2d 159; *Stewart Coach Industries, Inc. v. Moore* (S.D.Ohio 1981), 512 F.Supp. 879, paragraphs nine and ten of the syllabus.

Link alleged fraud in three areas: (1) false statements that Wagenheim made to Link prior to hiring him regarding the size and nature of Leadworks' sales force as well as the economic condition and growth of Leadworks; (2) statements that were false because Wagenheim had no present intent to pay Link the compensation to which they had agreed in the employment contract and; (3) false statements made by Wagenheim during Link's term of employment regarding Leadworks' financial condition and ability to pay wages to its employees, Link in particular.

Link testified that at the time he and Wagenheim negotiated Link's employment contract on March 2, 1988, Wagenheim represented to him that sales volume was $12,000,000 and increasing to $20,000,000 annually, that the company was growing at a rate of thirty to forty percent in 1988 over 1987, and that Leadworks' sales force, which was growing, covered the entire country. Link maintains that he took the job at Leadworks relying on such representations of the company's financial health and growth prospects. However, he asserted that such representations were false since there were no in-house sales people at all. Instead, Leadworks had only ten to fifteen independent, nonexclusive representatives. In addition, the company was experiencing no growth in 1988 and in the three months prior to Link's beginning work, the company's losses amounted to $250,000. Since he admitted he received the financial numbers of the company monthly, Wagenheim's representations to Link on March 2, 1988 were false.

In his deposition, Wagenheim denied making such representations to Link. He argues that if such representations were made they were accurate ones. He asserts that at the time he initially met with Link, he had access only to financial statements of the company until November 1987, which revealed sales of over $4,000,000 for the four preceding months. As a result, his prediction of over $12,000,000 in sales, annualized for 1988, was appropriate. Wagenheim further argues that such a projection constituted a prediction or expectation which is not actionable for fraud.

Construing the evidence in favor of Link, the nonmoving party, we believe that there is a genuine question of material fact regarding whether Wagenheim made false statements of fact with the present intention not to fulfill his promise to pay Link's wages. Wagenheim's statement of the percentage increase in sales of 1988 over 1987 may well not have constituted a prediction of the future financial well-being of Leadworks. In view of the conflicting

testimony of Wagenheim concerning whether he reviewed the financial statements monthly or periodically, we believe that summary judgment was improper, since such material questions of fact remain.

After Link's salary was cut in half on two occasions, Link asserts that Wagenheim represented to him that the salary reductions would be cured quickly and that the problem causing the reduction had been corrected. Wagenheim admitted reviewing the financial records prior to making such statements to Link and other employees. Documentary evidence was presented that Leadworks was in dire financial straits at the time such statements were made and had been so for at least three months. Link claimed that he relied on such statements and stayed on with the company. However, Wagenheim asserts that he merely hoped that the condition would improve and that he conveyed the same to Link and others.

We believe conflicting factual issues remain which are genuine and material to the resolution of Link's allegation of fraud. As a result, we believe that partial summary judgment was granted improvidently.

Appellant's second assignment of error is sustained.

### III

Appellant's third assignment of error states:

"The trial court erred in granting summary judgment on the corporate alter ego claims (Counts 5 and 9)."

The basic principles of the alter ego doctrine in Ohio were set forth in *Bucyrus–Erie Co. v. Gen. Products Corp.* (C.A.6, 1981), 643 F.2d 413. The corporate fiction should be disregarded when "(1) domination and control over the corporation by those to be held liable is so complete that the corporation has no separate mind, will, or existence of its own; (2) that domination and control was used to commit fraud or wrong or other dishonest or unjust act, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.* at 418. The factors to be considered in determining when the above principles should be applied include the observance of corporate formalities, undercapitalization, fraud, and the result of unjust or inequitable consequences in the event the corporate fiction were retained. *Id.* at 418–419.

Link alleged that the corporate veil should be pierced and that Wagenheim's actions require that the corporate entity of Leadworks be disregarded. Link contends that Wagenheim disregarded corporate formalities, commingled personal funds with those of the corporation, and paid for various personal expenditures from Leadworks' corporate funds. Leadworks presented documentation that it existed as a legitimate corporation in Ohio

and that it met formal requirements of corporations such as incorporation, meetings of directors, and maintenance of its own bank accounts. However, we believe there is a genuine issue of material fact concerning whether Wagenheim dominated that corporate form by spending Leadworks' corporate funds for personal expenditures and his family. Contradictory evidence remains whether one or both daughters worked for Leadworks even though both were paid. Wagenheim stated that payments made to one daughter constituted an assignment of his own salary, which was reflected on his tax return. In addition, Link presented evidentiary materials that Wagenheim used company funds to make a daughter's car payments, to pay for her personal homeowner's insurance, and personal utilities for his residence, as well as to pay for a vacation home that he owned with his wife. In view of the foregoing, we believe that the trial court's grant of partial summary judgment for appellees on Link's alter ego claims was improper.

Appellant's third assignment of error is sustained.

## IV

Appellant's fourth assignment of error states:

"The trial court erred in granting summary judgment on the fraudulent conveyances claims (Counts 7 and 8)."

A fraudulent conveyance occurs either when a debtor transfers assets without receiving adequate consideration, when a debtor transfers assets during insolvency or resulting in insolvency, or where a debtor transfers assets for the purpose of delaying or defrauding creditors. R.C. 1336.07; *Locafrance United States Corp. v. Interstate Distrib. Serv., Inc.* (1983), 6 Ohio St.3d 198, 6 OBR 252, 451 N.E.2d 1222. R.C. 1336.01(B) defines a "conveyance" as follows:

" 'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."

The transfer of customer accounts from one business to another falls under the ambit of a transfer of an asset under R.C. 1336.01(B). *Locafrance United States Corp., supra,* 6 Ohio St.3d at 200, 6 OBR at 253, 451 N.E.2d at 1224.

Link alleges that money from Leadworks' customers after the company's close was improperly taken by Wagenheim to pay Xonex's bills when the money should have been sent to Leadworks' secured creditors, National City Bank and Marine Midland Bank. Appellees, however, furnished documentation and testimony indicating that Xonex paid for all of its assets for fair consideration and that Wagenheim's oversight in using the proceeds from a

Leadworks' customer receivable's account to pay a Xonex bill was cured by subsequent payment to Marine Midland for the same amount.

At the same time, we believe there is a genuine issue of material fact about whether some conveyances were fraudulent. Evidence in the record indicates that Wagenheim may have used Leadworks' money and checks to pay for booth space and trade show attendance for Xonex. There is also evidence that Xonex may have used certain packaging equipment such as crates and boxes without having acquired such assets for fair value. Other assets owned by Leadworks such as its time clock, a radar detector, and a cellular phone, among others, may also have been used by Xonex or Wagenheim without indication that they were purchased for fair value.

As a result, we believe that a genuine issue of material fact remains with respect to whether certain conveyances were made fraudulently.

Appellant's fourth assignment of error is sustained.

## V

Appellant's fifth assignment of error states:

"The trial court erred in failing to grant plaintiff's motion to strike pursuant to Rule 56(E), O.R.C.P. where the record demonstrates that the documents to which the motion was directed were uncertified and admitted not to be based on the movant's personal knowledge."

In his motion for partial summary judgment, Wagenheim appended tax returns from 1988 and 1987 to support his argument that certain payments and items were included as income to him.

Link filed a motion to strike the tax returns because they were neither sworn nor certified documents and thus barred by Civ.R. 56(E). The trial court did not rule on Link's motion to strike before it granted appellees' motion for partial summary judgment.

Wagenheim's deposition testimony indicated that other people in his company or accountants prepared his tax forms and, as a result, he was not in a position to comment about the contents of the tax returns. However, Wagenheim did file an affidavit in which he verified that such returns were authentic.

Copies of documents referred to in an affidavit attached to a summary judgment motion should be certified. Civ.R. 56(E); *State ex rel. Corrigan v. Seminatore* (1981), 66 Ohio St.2d 459, 20 O.O.3d 388, 423 N.E.2d 105. While the tax returns in question were not certified, Wagenheim did vouch for their authenticity in his affidavit. Provided with such an affidavit, we do not believe the trial court erred by considering the tax documents when

ruling on the motion for summary judgment. However, in view of our analysis above, a genuine issue of material fact exists with respect to whether certain expenditures by Wagenheim and Leadworks were personal ones and not reflected as salaried income on Wagenheim's tax returns.

Appellant's fifth assignment of error is overruled.

The judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

MATIA, C.J., and FRANCIS E. SWEENEY, J., concur.