RESOURCE TITLE AGENCY, INC., et al., Plaintiffs,

v.

MORREALE REAL ESTATE SERVICES, INC., et al., Defendants.

No. 1:03 CV 2516.

United States District Court, N.D. Ohio, Eastern Division.

April 20, 2004.

David M. Cuppage, Climaco Lefkowitz Peca Wilcox & Garofoli, Cleveland, OH, for Plaintiffs.

Robert G. Schuler, Eve M. Ellinger, Timothy T. Tullis, Kegler, Brown, Hill & Ritter, Columbus, OH, for Morreale Real Estate Services, Inc., defendant.

Eric B. Levasseur, Steven A. Goldfarb, Hahn, Loeser & Parks, Cleveland, OH, for Cendant Mobility Services Corporation, defendant.

Anthony F. Stringer, Christopher S. Williams, Calfee, Halter & Griswold, Cleveland, OH, Eve M. Ellinger, Timothy T. Tullis, Kegler, Brown, Hill & Ritter, Columbus, OH, for Morreale Mack & Terry, D.C., defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

WELLS, District Judge.

Before the Court is defendant Cendant Mobility Services Corporation's ("Cendant") motion to dismiss plaintiffs' complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for their failure to state a claim. (Docket # 16).[1] Plaintiffs Resource Title Agency, Inc. ("RTAI") and Resource Title Agency of Michigan, Inc. ("RTAI–Michigan") (referred to as "the Resource Title Agencies" or "the Agencies") have filed a brief in opposition. (Docket # 19). Cendant also filed a reply. (Docket # 22).

For the reasons set forth below, defendant Cendant's motion is denied as to all of the Resource Title Agencies' claims against Cendant, but the Agencies are ordered to plead their fraud claims with greater specificity.

## I. THE RESOURCE TITLE AGENCIES' COMPLAINT[2]

Sharing the same ownership and corporate offices, plaintiffs RTAI and RTAI–Michigan are independent full service title agencies which coordinate real estate and financial transactions with third parties. (Am. Compl. at ¶¶ 1–3). Defendant Cendant is a leading provider of global management and workforce development solutions, assisting corporations, the military and member organizations with job related transfers and individually motivated relocation. (Am. Compl. at ¶ 5). Cendant manages a network of local suppliers, or "local closing teams," which perform real estate closing functions. (Am. Compl. at ¶ 5).

---

1. Cendant filed an earlier motion to dismiss which this Court denied as moot because plaintiffs filed an Amended Complaint in the interim. (Docket # 4).

2. In ruling on Cendant's motion to dismiss, this Court accepts as true all of the Resource Title Agencies' factual allegations. *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 724 (6th Cir.1996).

From approximately 1984 through 1998, the Resource Title Agencies provided real estate closing services to Cendant, including on-the-ground support, management of title searches, and facilitating local closings of transactions, through Cendant's "attorney closing network." (Am. Compl. at ¶ 8). While Cendant would request such services from the Resource Title Agencies, the Agencies would not actually be compensated for these services until after the particular real estate transaction closed. (Am. Compl. at ¶¶ 12–13).[3] Cendant assured the Agencies that they would be the designated title agencies to close the transactions and would be compensated at closing and also agreed to pay them cancellation charges for services provided in transactions which were cancelled prior to closing. (Am. Compl. at ¶¶ 8 and 12).

In late 1998, the Agencies were notified by Cendant that they were going to be replaced by defendant Morreale, Mack & Terry ("MM & T") and, subsequently, Morreale Real Estate Services, Inc. ("Morreale"). (Am. Compl. at ¶ 9).[4] While Cendant stopped sending new orders to the Resource Title Agencies, the Agencies continued to process closings and equity transactions from the then-current inventory according to the instructions of Cendant and MM & T. (Am. Compl. at ¶ 10). In or about January 1999, MM & T, and subsequently Morreale, began outsourcing title work to the Agencies on behalf of and for the benefit of Cendant. (Am. Compl. at ¶ 14). MM & T and Morr-

eale both instructed the Resource Title Agencies to bill for the preliminary exam and commitment at the time the commitment was created and agreed to pay cancellation fees for services provided on files which were cancelled. (Am. Compl. at ¶ 14).

On or about 15 February 2000, both RTAI and RTAI–Michigan and Morreale entered into Service Pact Agreements, containing Service Pact Guidelines for Cendant Mobility Services Corporation/Morreale Real Estate Services. Inc. ("the Agreements"). (Am. Compl. at ¶¶ 15–16, Exs. A and B). Pursuant to the Agreements, the Resource Title Agencies were hired by Morreale to provide local team closing services in all aspects of real estate closings. (Am. Compl. at ¶¶ 15–16, Exs. A and B). The Agreements provided that all correspondence and communications must be conducted through Morreale and that the Agencies were not to contact the client (i.e.Cendant).[5] (Am. Compl. at ¶¶ 15–16, Exs. A and B). The Agreements also provided that "[a]fter agreement has been reached, fees charged by [the Agencies] will be standard on all files," that all fees will be collected at closing, and that cancellation charges will be negotiated at the point of cancellation. (Am. Compl. at ¶¶ 15–16, Exs. A and B). Ultimately, Morreale and the Resource Title Agencies agreed, pursuant to the Agreements, that if any files were cancelled prior to closing, RTAI–Michigan and RTAI would receive

---

3. It is not exactly clear from the complaint whether Cendant's policy of not paying the Resource Title Agencies until closing applied throughout the course of their relationship or only during the period in 1999 when the Agencies were processing closings from the then-current inventory. Both parties, however, viewed this allegation as applying to the duration of their relationship.

4. Defendants MM & T and Morreale are service providers which coordinate real estate

closing and escrow services on behalf of and for the benefit of Cendant. (Am. Compl. at ¶¶ 4–5). At some point in 1999, MM & T transferred its attorney network closing services business to Morreale. (Am. Compl. at ¶ 14).

5. Both parties agree that Cendant was the "client" under the Agreements. (Docket # 16, at 3, and # 19, at 3).

$600 and $700, respectively, for services performed prior to cancellation. (Am. Compl. at ¶ 20). While the Resource Title Agencies were prohibited from contacting Cendant during the course of the Agreements, Cendant continued to contact the Agencies directly to request services and to inquire as to the status of various real estate transactions. (Am. Compl. at ¶ 17).

During the parties' course of dealing, the Resource Title Agencies inquired directly with MM & T and/or Morreale about the status of various files so they could collect payment for services rendered. (Am. Compl. at ¶ 21). While defendants MM & T and Morreale failed and refused to provide accurate and timely information as to the status of files, they reassured the Agencies that invoices would be paid when these files closed. (Am. Compl. at ¶ 22). In or about December 2001, the Agencies were advised by defendants that the files the Agencies were inquiring about were cancelled and that defendants would not pay for cancelled files. (Am. Compl. at ¶ 23). The Resource Title Agencies claim that many of these allegedly cancelled files were actually closed by third-party providers. (Am. Compl. at ¶ 24). At all times, defendants Cendant, MM & T, and Morreale failed and refused to pay cancellation charges on files cancelled and to pay for services requested in files eventually closed by third-party providers. (Am. Compl. at ¶ 27).

Based on this alleged factual context, the Resource Title Agencies allege, in their amended complaint, four different causes of action against defendant Cendant: 1) Breach of Contract (Counts Three and Four); 2) Unjust Enrichment (Counts Seven and Eight); 3) Fraud (Counts Eleven and Twelve); and, 4) Promissory Estoppel (Count Thirteen).[6] (Docket # 6). All four

causes of action relate to Cendant's purported failure to pay for real estate services rendered by the Agencies with respect to files which were cancelled or closed by other companies.

## II. MOTION TO DISMISS STANDARD

In considering a motion to dismiss under Rule 12(b)(6), the Court must construe the complaint liberally in the plaintiff's favor and accept all of plaintiff's factual allegations as true. *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir.1996). The Court's task is necessarily a limited one, as "the issue is not whether a [party] will ultimately prevail but whether the [party] is entitled to offer evidence to support the claims." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir.1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Indeed, a Rule 12(b)(6) motion to dismiss will be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir.1996) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (holding dismissal to be appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief). If, however, the complaint fails to contain "either direct or inferential allegations respecting all the material elements" necessary to sustain recovery under some viable legal theory, it will be dismissed pursuant to Rule 12(b)(6). *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 346 (6th Cir.2000) (quoting *Scheid v. Fanny Farmer Candy*

---

**6.** The Resource Title Agencies' complaint contains two separate counts against Cendant for breach of contract, unjust enrichment, and

fraud because it differentiates RTAI's claims from RTAI–Michigan's.

*Shops, Inc.,* 859 F.2d 434, 436 (6th Cir. 1988)).

## III. LAW AND ANALYSIS

### A. Breach of Contract

In their breach of contract claims, the Resource Title Agencies contend that Cendant breached both a verbal agreement and, as a third-party beneficiary, the terms of the Service Pact Agreement entered into by the Agencies and defendant Morreale. The Agencies' amended complaint actually contemplates two separate time periods, pre–1999 and post–1999, during which they provided services for the benefit of Cendant. After a brief discussion of Ohio contract law, the Court separately considers the purported verbal agreements and Service Pact Agreement.

#### 1. Ohio Contract Law

 To prove a breach of contract under Ohio law, the following elements must be established: 1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff. *Samadder v. DMF of Ohio, Inc.,* 154 Ohio App.3d 770, 778, 798 N.E.2d 1141 (2003); *Doner v. Snapp,* 98 Ohio App.3d 597, 600, 649 N.E.2d 42 (1994); *Thomas v. Publishers Clearing House, Inc.,* 29 Fed. Appx. 319, 322 (6th Cir.2002). As an enforceable contract is one of the basic prerequisites of a breach of contract claim, *Garofalo v. Chicago Title Ins. Co.,* 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995), a party must prove all the essential elements of a contract including an offer, acceptance, the manifestation of mutual assent, and consid-

eration (the bargained for legal benefit and/or detriment). *Kostelnik v. Helper,* 96 Ohio St.3d 1, 3, 770 N.E.2d 58 (2002). A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations,* 61 Ohio St.3d 366, 369, 575 N.E.2d 134 (1991). Terms of an oral contract may be determined from "words, deeds, acts, and silence of the parties." *Kostelnik v. Helper,* 96 Ohio St.3d 1, 3, 770 N.E.2d 58 (2002).

#### 2. Alleged Verbal Agreements Between the Agencies and Cendant

##### a. Pre–1999 Verbal Agreement

 The Resource Title Agencies allege that, between 1984 and December 1998, Cendant retained them to perform various real estate services, that Cendant agreed to pay cancellation charges based on services provided by the Agencies, and that Cendant has failed to pay the Agencies for services that Cendant ordered and the Agencies provided.[7] Cendant does not dispute that the Resource Title Agencies have properly pled the existence of an oral contract, rather it claims that the Agencies failed to "allege any breach or failure to pay by Cendant for services performed by Plaintiffs." (Docket # 16, at 6). It argues that the Resource Title Agencies have failed to specifically allege that Cendant's failure to pay for services arose out of transactions governed by this oral contract. (Docket # 22, at 2).[8] Such an argument is strained and ignores the mandate that complaints be read liberally and facts

---

7. The Resource Title Agencies also allege that, after Cendant stopped requesting new services from them, it continued to instruct the Agencies to process closing and equity transactions from the Agencies' then-existing inventory.

8. In an attempt to convince this Court of weaknesses in the Resource Title Agencies' case, Cedant introduces facts which it admits were not alleged in the complaint. Such arguments are not appropriate in a motion to dismiss which simply analyzes the sufficiency of the complaint.

be construed in the plaintiff's favor. Under the subheading "From 1984–1998 Cendant Retained Resource to Provide Local Team Closing Services," the Resource Title Agencies allege that Cendant failed to pay for services it ordered. Even without a liberal construction of the Agencies' complaint, it would be reasonable to assume that the Agencies are alleging that Cendant failed to pay for services originating under that oral contract.

### b. Post–1999 Verbal Agreement

During the existence of the written Service Agreements with Morreale and after the termination of their direct relationship with Cendant, the Agencies allege that Cendant continued to contact them directly to request services covered by the Service Agreements. While Cendant's potential liability under the Service Agreements will be discussed below, it suffices here to conclude that the Agencies failed to allege the existence of a post–1999 verbal agreement between Cendant and themselves which governed transactions apart from the Service Agreements.

### 3. Service Pact Agreements

The Resource Title Agencies also allege that Cendant, as a third-party beneficiary to the Agreements between the Agencies and Morreale, is liable for breaching the terms of those Service Agreements. Cendant responds that an intended third-party beneficiary may bring an action on the contract, but it does not incur any legal duties or obligations under the contract, which could subject it to liability.

It is well established that a contract is binding only upon parties to a contract and those in privity with them. *Samadder v. DMF of Ohio, Inc.,* 154 Ohio App.3d at 778, 798 N.E.2d 1141 (citing *American Rock Mechanics, Inc. v. Thermex Energy Corp.,* 80 Ohio App.3d 53, 58, 608 N.E.2d 830 (1992)). Accordingly, an action for breach of contract can only be maintained by the parties to the contract or those deriving rights from the contracting parties, such as an intended third-party beneficiary. *Grant Thornton v. Windsor House, Inc.,* 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991); *American Rock Mechanics, Inc.,* 80 Ohio App.3d at 58, 608 N.E.2d 830. A third-party beneficiary does not acquire any rights greater than those set forth in the contract by the parties. *Ohio Sav. Bank v. H.L. Vokes Co.,* 54 Ohio App.3d 68, 71, 560 N.E.2d 1328 (1989) (citing *Union Savings & Loan Co. v. Cook,* 127 Ohio St. 26, 186 N.E. 728,) paragraph one of the syllabus (1933). In this case, while the only parties to the Agreements were the Agencies and Morreale, the Agencies allege that Cendant is a third-party beneficiary to the Agreements. Accordingly, based on the allegations as pled by the Resource Title Agencies, it is clear that the Agencies could sue Morreale for breach of contract and that Cendant and Morreale could sue the Agencies. However, the remaining question is whether Ohio law provides for liability for an intended third-party beneficiary; that is, whether the Agencies can sue Cendant under the Agreements.

While third party beneficiaries are generally subject to the same contract defenses available against the contracting parties themselves, *Noe v. R.D. Jones, Excavating, Inc.,* 787 F.Supp. 759, 763 (S.D.Ohio 1992), there is very little authority addressing the question of whether and/or when third-party beneficiaries assume actual liability under a contract. Two Ohio Court of Appeals' decisions, however, provide support for the Resource Title Agencies' legal theory that an intended third-party beneficiary may be held liable under the terms of the contract. In *Ohio Match Co. v. Elm Grove Min. Co.,* 5 Ohio Law Abs. 151 (1927), Oco Coal Co. ("Oco Coal") had become indebted to Ohio Match in the

amount of $550,000. 5 Ohio Law Abs. at *1. Subsequently, the Elm Grove Mining Company ("Mining Company") purchased Oco Coal for $600,000, paying $50,000 in cash with the balance of $550,000, evidenced by notes secured by mortgage on the mine, which notes ran directly to the Ohio Match. *Id.* While Ohio Match did not sign the purchase agreement, it began accepting shipments of coal and making payments to the Mining Company in accordance with the terms of the agreement. *Id.* When Ohio Match refused to pay the price for the coal as stipulated by the agreement, the Mining Company sued Ohio Match. *Id.* The Ohio Court of Appeals held that Ohio Match, an intended third-party beneficiary, obligated itself to pay the price stipulated in the agreement when it accepted the shipments of coal under the agreement. *Id.* (noting that, by accepting the benefits of the contract, Ohio Match also accepted the burdens).

More recently, the Ohio Court of Appeals again concluded that an intended third-party beneficiary accepted obligations under the contract when he accepted its benefits. *Saum v. Moenter*, 101 Ohio App.3d 48, 53, 654 N.E.2d 1333 (1995). In *Saum*, the Court held that a former husband was liable to his former wife's parents for a loan made to his former wife before they were married even though he was not a party to the loan and did not negotiate its terms. *Id.* at 52–53, 654 N.E.2d 1333. Finding that the husband was an intended third-party beneficiary of the loan because it was made to enable the couple to acquire financing to build their home, the Court held that he became obligated on the loan by accepting its benefits and by assenting to payments made on the loan out of their joint checking account during marriage. *Id.* at 53, 654 N.E.2d 1333. *Saum* is particularly instructive because it involves a situation where the plaintiff elected to sue the third-party beneficiary instead of the contracting party, even though the contracting party was still in existence.

■ While both of these cases are highly fact-specific and do not stand for the general proposition that intended third-party beneficiaries always assume liabilities under the contract, they illustrate that, in particular cases, a third-party beneficiary may be so held liable. Construing the facts pled by the Resource Title Agencies in their favor, it cannot be said beyond a doubt that they could not recover against Cendant as a third-party beneficiary under the terms of the Agreements.

### 4. Summary

Though the Resource Title Agencies failed to allege the existence of a post–1999 verbal agreement with Cendant, the Agencies did sufficiently allege a breach of contract claim based on their pre–1999 verbal agreement with Cendant and on their written Agreements. Accordingly, this claim will not be dismissed.

### B. *Unjust Enrichment*

■ In their unjust enrichment claims, the Resource Title Agencies allege that they were requested by Morreale, MM & T, and Cendant to perform real estate closing services for the benefit of Cendant, that such services conferred a benefit on Cendant by enabling it to prepare deed packages and written purchase offers, and that such benefits were unjustly retained by Cendant when it refused to make payments to the Agencies for those services. These factual allegations mirror the three necessary requirements for unjust enrichment claims: 1) plaintiff conferred a benefit on defendant; 2) defendant knew of such benefit; 3) defendant retained the benefit under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298

(1984); *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir.2003). As the doctrine of unjust enrichment is an equitable remedy designed to prevent injustice, the plaintiff must not only show that a benefit was conferred on defendant, but also that the retention of that benefit without payment, under the circumstances, would be unjust. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir.2003). The defendant need not necessarily have acted improperly as unjust enrichment also results from a failure to make restitution where it is equitable to do so. *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860–61 (6th Cir.2002). Ohio courts give a fairly broad scope to quasi-contract, thereby rejecting the formalities of classical contract doctrine. *Id.* at 862.

Still, Cendant contends, in two separate, but related arguments, that the Agencies' unjust enrichment claims fail as a matter of law because their remedy is limited to the Agreements, arguing that: 1) when services were provided under an express contract, a plaintiff cannot recover from a non-party to that contract on the basis of unjust enrichment; and 2) a theory of unjust enrichment is not permitted where an express contract governs the same subject matter. The first argument is really a special application of Cendant's more general second argument and more directly coincides with the facts of this case as pled in the amended complaint. Assuming, as pled, an express contract exists between the Agencies and Morreale for the provision of certain real estate services on behalf of Cendant, an intended third-party beneficiary, the question becomes whether the Agencies can recover from Cendant, a non-party to the agreements, for unjust enrichment.

█ While Ohio law generally does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject, *Ullmann v. May*, 147 Ohio St. 468, 72 N.E.2d 63, syllabus paragraph and 478–79 (1947); *Randolph v. New England Mut. Life Ins.*, 526 F.2d 1383, 1387 (6th Cir.1975) (noting that such quasi-contractual remedies are generally not available where the parties are bound by a valid and enforceable contract), these cases generally involve claims between two parties to a contract. Even in those cases, however, unjust enrichment may be pled in the alternative when the existence of an express contract is in dispute, *Lightbody v. Rust*, 2003 WL 21710601, at *8 (Ohio.App. 2003), and may be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality, *Wolfer Enterprises v. Overbrook Development Corp.*, 132 Ohio App.3d 353, 357, 724 N.E.2d 1251 (1999).

The question presented in this case is not whether unjust enrichment is available against the party to the contract but rather against a non-party. While such claims are generally precluded, "[c]ircumstances may exist to support an unjust enrichment claim against a non-contracting party who benefits from the uncompensated work of one of the parties to the contract." *Nationwide Heating & Cooling, Inc. v. K & C Construction*, 1987 WL 16802, at *2 (Ohio App.1987). For example, in *Reisenfeld*, a sub-broker entered into a written commission agreement with a broker which provided that the broker would pay him a commission if a deal was reached between a sublessor and sublesee. 277 F.3d at 859. In *Reisenfeld*, the Sixth Circuit held that, when the broker failed to pay the commission, the sub-broker could bring an unjust enrichment action against the sublessor, even though the sublessor was not a party to the contract between the sub-broker and broker. *Id.* at 862.

Likewise, in the construction context, Ohio courts have held that, when a subcontractor is not paid by the contractor and

the owner has not paid the contractor for the aspect of the job at issue, the subcontractor can recover from the owner on a theory of unjust enrichment. *Id.* at 861 (citing *Ross–Co Redi Mix Co. v. Steveco, Inc.,* 1996 WL 54174, at \*3 (Ohio Ct.App. 1996); *Brower Prods. Inc. v. Musilli,* 1999 WL 317122, at \*2 (Ohio Ct.App.1999); *Booher Carpet Sales, Inc. v. Erickson,* 1998 WL 677159, at \*7 (Ohio Ct.App.1998); *Steel Quest, Inc. v. City Mark Constr. Servs.,* 1997 WL 674614, at \*2 (Ohio Ct. App.1997)). Similarly, Ohio courts have allowed unjust enrichment claims against a non-party lessee by a contractor who provided services to a lessor, *Kazmier v. Thom,* 63 Ohio App.2d 29, 31–32, 408 N.E.2d 694 (1978); *Andy's Glass Shops v. Leelanau Realty,* 50 Ohio App.2d 355, 363 N.E.2d 601 (1977). Moreover, in *Saum,* the Court of Appeals explained that, even if the plaintiffs could not recover on a breach of contract theory against the defendant as a third-party beneficiary to the contract, they would still be entitled to recovery on an unjust enrichment theory. 101 Ohio App.3d at 53, n. 7, 654 N.E.2d 1333.

Defining a particular situation as either just or unjust is inherently subjective resulting in a malleable and unpredictable standard. *Reisenfeld,* 277 F.3d at 860. Given the case law supporting the type of claim advanced by the Resource Title Agencies, the inherent flexibility of the doctrine of unjust enrichment, and the posture of this case, it cannot be said that there is no set of facts upon which the Agencies could state a claim against Cendant.

## C. *Fraud*

The Resource Title Agencies' fraud claims are based on the allegations that Cendant intentionally misrepresented that the Agencies would be the designated title agencies to complete those real estate transactions for which the Agencies had already provided some services at Cendant's request and would be paid at closing on the HUD Settlement Statement. To establish a claim for intentional misrepresentation/fraud under Ohio law, the plaintiff must show: 1) a representation or, where there is a duty to disclose, concealment of a fact, 2) which is material to the transaction at hand, 3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, 4) with the intent of misleading another into relying upon it, 5) justifiable reliance upon the representation or concealment, and 6) a resulting injury proximately caused by the reliance. *Burr v. Stark Cty. Bd. of Commrs.,* 23 Ohio St.3d 69, 491 N.E.2d 1101, paragraph two of the syllabus (1986); *Andersons,* 348 F.3d 496 at 505. While fraud is generally predicated on a misrepresentation relating to a past or existing fact, a promise or representation relating to a future action is fraudulent and actionable if the individual, at the time he or she makes it, has no intention of keeping the promise. *Williams v. Edwards,* 129 Ohio App.3d 116, 124, 717 N.E.2d 368 (1998); *Nilavar v. Osborn,* 127 Ohio App.3d 1, 21–22, 711 N.E.2d 726 (1998); *Link v. Leadworks Corp.,* 79 Ohio App.3d 735, 742, 607 N.E.2d 1140 (1992).

Cendant contends that the Resource Title Agencies have failed to state a claim for fraud because: 1) their contract claim prevents them from presenting the same case as a tort claim; 2) their fraud claims are precluded by the statute of limitations; and 3) their fraud claims are not pled with the specificity required by Rule 9(b). The Court addresses each argument in turn.

### a. *Effect of the Contractual Relationship*

Because, under Ohio law, the existence of a contract action generally .

excludes the opportunity to present the same case as a tort claim, *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir.1981), the issue presented here is whether the Agencies' fraud claims are actually breach of contract claims in disguise. In determining whether a cause of action lies in tort or contract, courts must look to "the nature of the grievance rather than the form of the pleading." *Meeker v. Shafranek*, 112 Ohio App. 320, 323, 176 N.E.2d 293 (1960). If the gravamen of the complaint is for breach of contract, the cause of action will not be transformed into one sounding in tort by the charge of tortious conduct or the addition of the adverbs intentionally, willfully, and fraudulently. *Ketcham v. Miller*, 104 Ohio St. 372, 136 N.E. 145, syllabus (1922); *Meeker*, 112 Ohio App. at 323, 176 N.E.2d 293; *Schwartz v. Bank One, Portsmouth, N.A.*, 84 Ohio App.3d 806, 810, 619 N.E.2d 10 (1992); *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 118–19 (6th Cir.1976).

■ Because it is generally not a tort to breach a contract, no matter how willful or malicious the breach, as the motive of the breaching party is irrelevant to the action, a party may not assert a cause of action for a fraudulent breach of contract, absent a specific duty imposed by law separate from the contract. *Salvation Army v. Blue Cross & Blue Shield of N. Ohio*, 92 Ohio App.3d 571, 578, 636 N.E.2d 399 (1993); *Wolfe*, 647 F.2d at 710 (citing *Ketcham*, 104 Ohio St. 372, 136 N.E. 145). A party may, however, assert a specific claim of fraud in the inducement by pleading the same elements as generally re-

quired for fraud. *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502–3, 692 N.E.2d 574 (1998); *Medical Billing, Inc. v. Medical Management*, 212 F.3d 332, 338 (6th Cir.2000). A fraudulent inducement claim often involves "a misrepresentation of facts outside the contract or other wrongful conduct induc[ing] a party to enter into the contract." *ABM Farms*, 81 Ohio St.3d at 502–3, 692 N.E.2d 574.

■ In this case, the Resource Title Agencies assert claims for fraudulent inducement by alleging that Cendant made certain promises or representations, which Cendant never intended to keep, to induce the Agencies to provide services. Relying on *ABM Farms* and *Integrity Technical Services, Inc., v. Holland Management, Inc.*, 2002 WL 31175271 (Ohio App.2002), Cendant argues that the Agencies' claims must fail because they do not allege any facts outside the contractual agreement. (Docket # 22, at 10). Cendant misinterprets the force of these decisions as neither stands for the general proposition that a fraudulent inducement claim may not rest on a party's intent not to perform a contract at the time it enters into it.[9] On the contrary, Ohio courts have held that fraudulent inducement claims, based on a party's intent not to perform their terms at the time of contracting, are viable. *Link*, 79 Ohio App.3d at 742–44, 607 N.E.2d 1140. If a false representation induces the other party to enter into a contract, the contract may be voided. *Id.* at 742–43, 607 N.E.2d 1140.

---

9. In particular, by asserting that the Court of Appeals in *Integrity* held that "despite the fact party [sic] 'made a promise with the intent not to perform' this did not amount to fraudulent inducement" (Docket # 22, at 10), Cendant misrepresented its holding. The Court of Appeals did not find that the party made a promise with the intent not to perform, but rather concluded that

The evidence does not support the inference that in negotiating these provisions and including them in the contract, Holland Management falsely represented to Integrity that it would perform its contractual obligations with the intent to later avoid these obligations.

*Integrity*, 2002 WL 31175271, at *48.

While the Agencies' fraud and breach of contract claims both arise in part from Cendant's failure to pay for the Agencies' services, their fraud claims are based on Cendant's alleged intention not to perform the contract at the time it was entered into and its breach of contract claim is based on Cendant's purported nonperformance regardless of its intention at the outset or indeed at the time of the breach. This distinction is elaborated in *Wall v. Firelands Radiology, Inc.*, which explains that

> In order to be the basis for an action for fraud ... the alleged misrepresentation cannot be predicated simply upon a promise to perform that subsequently is unfulfilled. Rather, the plaintiff must prove by a preponderance of the evidence, that at the time the promise to perform was made, the promisor did not intend to fulfill the promise.

106 Ohio App.3d 313, 326, 666 N.E.2d 235 (1995). In this case, the Agencies have specifically pled that, at the time Cendant made its representations that it would pay the Agencies at closing, Cendant had no intention of doing so.

 Because the Resource Title Agencies have pled claims for fraudulent inducement separate from their breach of contract claims, their fraud claims should not be dismissed merely because they are asserting the contract claims as well.

### b. Statute of Limitations

 Both parties agree that, pursuant to O.R.C. § 2305.09, fraud claims are subject to a four year statute of limitations. By the express terms of the statute, the four-year limitations period does not commence to run on fraud claims presented until the fraud is, or should have been, discovered. *Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206, syllabus ¶ 2b (1989). Absent actual awareness, the standard to determine when a person should be aware of the fraud is when he or she possesses "facts sufficient to alert a reasonable person to the possibility of wrongdoing." *Palm Beach Co. v. Dun & Bradstreet, Inc.*, 106 Ohio App.3d 167, 171, 665 N.E.2d 718 (Ohio App.1995). The determination of when a reasonable person should have discovered fraudulent conduct is generally a factual inquiry, which should be left to the factfinder. *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (Ohio 1991); *Phelps v. Lengyel*, 237 F.Supp.2d 829, 838–40 (N.D.Ohio 2002). Such a determination is therefore inappropriate on a motion to dismiss.

### c. Pleading Specificity

 Cendant also claims that the Agencies' fraud claims should be dismissed for their failure to plead them with the specificity required under Fed.R.Civ.P. 9(b). Rule 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The purpose of Rule 9(b) is to provide the defendant with fair notice so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud. *Advocacy Organization for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir.1999). The Sixth Circuit reads this rule liberally requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent intent of the defendants; and the injury resulting from the fraud. *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir.1993); *Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir.1992). Rule 9(b)'s particularity requirement does not, however, mute the general principles set out in Rule 8 calling for simple, concise, and direct allegations; rather, the two rules must be read in harmony. *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679

(6th Cir.1988). Even against Rule 8's "backdrop admonition of simplicity in pleading," allegations of fraudulent misrepresentations must be made with "sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Organization for Patients and Providers,* 176 F.3d at 322 (citations omitted). The pleading requirements of Rule 9(b) may be relaxed where information is only within the opposing party's knowledge. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988) (noting that in some cases courts have allowed plaintiffs to conduct some discovery prior to amending their complaints).

 While the Resource Title Agencies have adequately alleged the content of the fraudulent representations and the injury purportedly caused by the misrepresentations, they have failed to sufficiently plead allegations related to the timing or manner in which the representations were made. However, in the absence of a motion for more definite statement under Rule 12(e), dismissal of a fraud claim, solely on account of a party's failure to satisfy the requirements of Rule 9(b), is inappropriate. *Coffey,* 2 F.3d at 162. If the Agencies intend to proceed on their fraud claims, they must, on or before 30 April 2004, amend their pleading to allege the approximate dates that the misrepresentations were made and the manner in which such representations were made, including whether the representations were oral or written, and who made the representations.[10]

### D. *Promissory Estoppel*

 In their promissory estoppel claim, the Resource Title Agencies allege that Cendant promised that the Agencies would be designated the title agencies to complete the real estate transactions and would be paid at closing, that they relied on those promises in providing real estate services to Cendant, that such reliance was to their detriment when Cendant refused to pay for services ordered and provided. The prima facie elements of promissory estoppel are: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance by the party to whom the promise was made; and, 3) injury resulting from such reliance. *Healey v. Republic Powdered Metals, Inc.,* 85 Ohio App.3d 281, 284–85, 619 N.E.2d 1035 (1992). The Agencies have sufficiently pled each of these elements.

 In its motion to dismiss, Cendant raises some of the same arguments that it did in conjunction with the Agencies' breach of contract claims. Specifically, it contends that the Resource Title Agencies have failed to allege any promises made by Cendant upon which they could have relied to their detriment. As already explained above, a liberal reading of the complaint demonstrates that, the Agencies did allege, both before and after December 1998, that Cendant requested certain services, that Cendant promised it would pay for those services, that the Agencies provided those services in reliance on those promises, and that Cendant failed to pay for the services rendered. Accordingly, Cendant's motion to dismiss is denied as to the Resource Title Agencies' promissory estoppel claim.

### IV. CONCLUSION

For the reasons set forth above, Cendant's motion to dismiss is denied as to all of the Resource Title Agencies' claims against Cendant (Counts Three, Four, Seven, Eight, Eleven, Twelve, and Thirteen of the Amended Complaint). The

---

10. While this Court has no 9(b) motion or motion to dismiss with respect to plaintiffs' fraud claims against MM & T and Morreale (Counts Nine and Ten), these claims are quite similar.

777

Court does conclude, however, that the Agencies' fraud claims (Counts Eleven and Twelve of the Amended Complaint) were not pled with the specificity required by Rule 9(b). Therefore, the Resource Title Agencies must amend their complaint, on or before 30 April 2004, to allege the approximate dates that the alleged fraudulent representations were made and the manner in which they were made, including whether the representations were oral or written and who made the representations. If the Agencies fail to so amend their complaint by 30 April 2004, their fraud claims against Cendant will be dismissed.

IT IS SO ORDERED.