OPINION
{¶ 1} Appellants, George A. Young ("George Young") and Maribel Young, appeal from the November 7, 2003 judgment entry of the Lake County Court of Common Pleas, granting the motions for summary judgment of appellees, Richard Russ ("Russ"), Timothy White ("White"), Gannett Co., Inc. ("Gannett Co."), and WKYC-TV3.
 {¶ 2} On May 31, 2002, appellants filed a complaint for defamation against appellees Russ, White, and Gannett Co. Appellees Russ, White, and Gannett Co. filed an answer on July 3, 2002.[1] On July 12, 2002, appellants filed a motion, pursuant to Civ.R. 15(A), for leave to amend their complaint to join appellee WKYC-TV3 as a new party defendant, which was granted by the trial court on August 12, 2002. Appellees Russ, White, Gannett Co., and WKYC-TV3 filed an answer to appellants' amended complaint on September 27, 2002.
 {¶ 3} On April 11, 2003, appellees Russ and WKYC-TV3 filed a joint motion for summary judgment pursuant to Civ.R. 56, and appellees White and Gannett Co. filed separate motions for summary judgment.[2] On May 7, 2003, appellants filed memoranda in opposition to appellees' motions for summary judgment, and appellees filed replies on May 16, 2003.
 {¶ 4} Appellant George Young was employed by the Painesville City Board of Education ("PCBOE") as head custodian/lunchroom monitor for Huntington Elementary School ("Huntington"). According to appellant George Young's affidavit, on February 7, 2002, during lunch at Huntington, a group of girl students reported that Ignacio Rios ("Rios"), a fourth grader, called them names. Appellant George Young observed Rios move from one table to another which was against the rules. Appellant George Young indicated that he told Rios several times to go to a detention table, but Rios refused. Appellant George Young stated that he removed Rios from his seat, at which time Rios violently kicked, punched, and yelled obscenities. Appellant George Young ultimately removed Rios from the cafeteria and was instructed by Huntington's principal, Judith Poluga ("Poluga"), to take Rios to her office. Appellant George Young said that although Rios continued to fight and struggle, he never hit, choked, or in any manner hurt Rios.
 {¶ 5} On February 14, 2002, another incident occurred in Huntington's cafeteria involving kindergartners and cousins, Cameron Kreiner ("Kreiner") and Boyd Miller ("Miller"). Appellant George Young observed Kreiner and Miller fighting, and indicated that Kreiner put his hands around Miller's neck. Appellant George Young stated that he told Kreiner to stop, picked him up, and sat him down in his chair.
 {¶ 6} On or about February 15, 2002, appellee WKYC-TV3 received a call from Stephanie Miller, the mother of Miller and aunt of Kreiner, claiming that appellant George Young was manhandling students. Appellee WKYC-TV3 assigned the potential story to reporter appellee Russ to investigate. Later that day, appellee Russ traveled to Painesville to interview and shoot footage of Stephanie Miller. Specifically, appellee Russ taped Stephanie Miller making statements about appellant George Young to the effect that he has manhandled children and that kids are afraid to go to school because of him. Stephanie Miller also told appellee Russ about the alleged altercation that occurred between Miller, Kreiner, and appellant George Young.
 {¶ 7} Appellee Russ went to the Kreiner residence and interviewed Kreiner, his parents, and his brother, Kyle, on camera. According to appellee Russ, Kreiner claimed that he was choked by appellant George Young when he picked him up then plopped him down for talking during lunch. Kyle, who was also present in the cafeteria on the day at issue, recounted a similar version of Kreiner's alleged incident with appellant George Young.
 {¶ 8} Appellee Russ then traveled to the PCBOE to speak with Superintendent Michael Hanlon ("Hanlon") and Assistant Superintendent James Fodor ("Fodor") who indicated that they were not aware of the Kreiner incident but that they would get to the bottom of it.
 {¶ 9} On February 18, 2002, appellee Russ became aware of the incident involving appellant George Young and Rios. Appellee Russ and a cameraman went to Rios's home and interviewed Rios and his mother on camera. Rios indicated that appellant George Young lifted him up by the neck and threw him on the stage. Rios stated that his neck was very red from the incident.
 {¶ 10} During the next few days, appellee Russ interviewed several other Huntington students, including Ashley Schroeder ("Schroeder"), a classmate of Rios's who was present in the cafeteria during the incident. Schroeder corroborated Rios's version of the events with respect to appellant George Young's behavior.
 {¶ 11} On February 21, 2002, appellee Russ met with Poluga, Hanlon, and Fodor, and was told that the district as well as the police were investigating the matter. According to the depositions of Poluga, Hanlon, and Fodor, two meetings occurred on February 21, 2002, between the school officials and appellee Russ. The first meeting occurred in the morning between Hanlon, Fodor, and appellee Russ, and the second took place in the afternoon, among the three and Poluga.
 {¶ 12} Also, on February 21, 2002, Rios's mother filed a criminal complaint and Officer John Levicki ("Officer Levicki") with the Painesville City Police Department ("PCPD") was assigned to investigate. Officer Levicki traveled to Rios's home to interview his mother, then went to Huntington to interview Rios in the presence of Poluga. Poluga stated that the interview occurred prior to the second meeting with appellee Russ, Hanlon, Fodor, and herself, during the afternoon on February 21, 2002. Officer Levicki stated that Rios recanted his story and said that appellant George Young did not grab his throat. Officer Levicki indicated that Rios admitted that he made up the story to avoid getting in trouble for swearing and other misbehaviors. Officer Levicki advised Poluga that he would complete the investigation and was not filing charges. According to Poluga, she informed appellee Russ that Rios recanted his allegations regarding appellant George Young at the second meeting that afternoon.
 {¶ 13} Prior to the first broadcast on February 21, 2002, appellee Russ went to appellant George Young's home and interviewed him off-camera. Appellee Russ indicated that appellant George Young denied hurting any children.
 {¶ 14} Also, before the first broadcast, Hanlon sent a letter home with students that the school district was investigating allegations that appellant George Young was involved in incidents using force on students and that he would be reassigned to a position that did not involve direct contact with students. Later that afternoon, Stephanie Miller faxed the letter from Hanlon to appellee Russ. At that time, appellee Russ, along with the management at appellee WKYC-TV3, decided to air the story later that night on the 11:00 p.m. news. Before airing the story, appellee Russ's colleague, Lydia Esparra, interviewed Hanlon on-camera regarding the district's investigation.
 {¶ 15} During the first broadcast, anchorman appellee White introduced appellee Russ and the story, which included comments that some students were afraid to go to school because of appellant George Young, and that he had threatened and became physical with students. Appellee Russ described both incidents involving Kreiner and Rios and the alleged physical contact by appellant George Young. In addition, appellee included footage of Hanlon who stated that the safety of the students is paramount and that the district hopes to get answers in a few days. Appellee Russ also included that appellant George Young denied the allegations.
 {¶ 16} On February 22, 2002, appellee Russ was contacted by Kreiner's father. Appellee Russ met the Kreiners at the PCPD where they filed a police report. Officer Levicki denied appellee Russ and his cameraman access to his office. During the next several days, Officer Levicki investigated both Kreiner's and Rios's complaints and ultimately determined that charges would not be filed against appellant George Young due to lack of evidence of any crime. Rios's investigation was completed on February 26, 2002 and Kreiner's investigation was completed on February 28, 2002.
 {¶ 17} Prior to the completion of the investigations, a second broadcast aired at 6:00 p.m. on February 22, 2002. In that broadcast, appellee Russ focused on Kreiner's criminal complaint and the occurrence at the police station. Appellee Russ indicated that Kreiner's father was "steamed" about the allegations that appellant George Young physically disciplined his son. Appellee Russ included appellant George Young's side of the story and his denial of the allegations.
 {¶ 18} About one month later, around March 18, 2002, appellee Russ received a copy of another letter sent by Hanlon to parents in the school district. The letter discussed the investigation and the determination that appellant George Young was not found to be engaged in any unlawful or excessive behavior. The letter noted that appellant George Young was reinstated to his prior duties. This updated information was never broadcast by appellee WKYC-TV3.
 {¶ 19} Pursuant to its November 7, 2003 judgment entry, the trial court granted each of appellees' motions for summary judgment, as well as appellee Gannett Co.'s motion for attorney fees.[3] It is from that judgment that appellants filed a timely notice of appeal and make the following assignments of error:
 {¶ 20} "[1.] The trial court erred to the prejudice of [appellants] in awarding summary judgment to [appellees Russ] and [WKYC-TV3].
 {¶ 21} "[2.] The trial court erred in granting summary judgment in favor of [appellee White].
 {¶ 22} "[3.] The trial court erred in granting summary judgment to [appellee] Gannett Co.
 {¶ 23} "[4.] The trial court erred in its [d]ecision to award attorneys fees to [appellee] Gannett Co. under R.C. 2323.51 without either a hearing or a motion."
 {¶ 24} In their first assignment of error, appellants argue that the trial court erred in awarding summary judgment to appellees Russ and WKYC-TV3. Appellants contend that appellees Russ and WKYC-TV3 knew before the first broadcast that Rios recanted his accusations, that appellee Russ did not interview a reliable adult witness, and that appellees Russ and WKYC-TV3 knew the investigations were still open. Appellants stress that a reasonable jury could have found that appellees Russ and WKYC-TV3 acted negligently in broadcasting the two stories. In order for a summary judgment to be granted, the moving party must prove:
 {¶ 25} "* * * (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispaw v. Eckstein
(1996), 76 Ohio St.3d 383, 385. The Supreme Court stated in Dresher v.Burt (1996), 75 Ohio St.3d 280, 296, that:
 {¶ 26} "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim. The `portions of the record' to which we refer are those evidentiary materials listed in Civ.R. 56(C), such as the pleadings, depositions, answers to interrogatories, etc., that have been filed in the case. * * *" (Emphasis sic.)
 {¶ 27} If the moving party satisfies this burden, then the nonmoving party has the burden pursuant to Civ.R. 56(E) to provide evidence demonstrating a genuine issue of material fact. If the nonmoving party does not satisfy this burden, then summary judgment is appropriate. Civ.R. 56(E). Appellate courts review a trial court's granting of summary judgment de novo. Brown v. Scioto Cty. Bd. of Commrs. (1993),87 Ohio App.3d 704, 711. The Brown court stated that "we review the judgment independently and without deference to the trial court's determination." Id. An appellate court must evaluate the record "in a light most favorable to the nonmoving party." Link v. Leadworks Corp. (1992), 79 Ohio App.3d 735, 741. Furthermore, a motion for summary judgment must be overruled if reasonable minds could find for the party opposing the motion. Id.
 {¶ 28} "The elements of a common-law defamation claim are: (1) a false and defamatory statement concerning another; (2) an unprivileged publication of the statement to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. Iberis v. MahoningValley Sanitary District (Dec. 21, 2001), 11th Dist. No. 2000-T-0036, 2001 Ohio App. LEXIS 5837, at 17, citing Akron-Canton Waste Oil, Inc. v.Safety-Kleen Oil Serv., Inc. (1992), 81 Ohio App.3d 591, 601.
 {¶ 29} "[T]he plaintiff must prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication." Lansdownev. Beacon Journal Publishing Co. (1987), 32 Ohio St.3d 176, 180. "`Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" Id. at 180-181, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 30} With respect to defamation involving public officials and/or figures as opposed to private persons, the Supreme Court of Ohio inEmbers Supper Club, Inc. v. Scripps-Howard Broadcasting Co. (1984),9 Ohio St.3d 22, 24, stated that:
 {¶ 31} "[i]n New York Times Co. v. Sullivan [(1964), 376 U.S. 254], the United States Supreme Court held that a `public official' could not maintain a suit for defamation without showing a clear and convincing evidence that the publisher acted with actual malice. In CurtisPublishing Co. v. Butts [(1967), 388 U.S. 130], the court extended the actual malice standard to `public figures.' This standard was further expanded in 1971 when the Supreme Court decided the case of Rosenbloomv. Metromedia, Inc. (1971), 403 U.S. 29. In Rosenbloom, the court, in a plurality opinion, extended the actual malice standard to private individuals where the matter reported was of concern to the public."
 {¶ 32} The court in Embers, supra, at 25, held that the negligence standard of review is appropriate when dealing with cases involving defamation of private persons.
 {¶ 33} In the case at bar, since appellant George Young is a private person, the negligence standard of review is appropriate. Embers, supra, at 25.
 {¶ 34} The record establishes that appellee Russ's investigation, which was broadcast by appellee WKYC-TV3, was unreasonable. Pursuant to its November 7, 2003 judgment entry, the trial court determined that: "[t]he record is devoid of any evidence that [appellees] actually knew — prior to the broadcasts — that the children's accusations were false or exaggerated." In footnote three in its judgment entry, the trial court stated that: "[Poluga's] deposition testimony was unclear as to her recollection of the timing of the police investigation and her contact with Officer Levicki and with [appellee] Russ." We disagree.
 {¶ 35} Pursuant to Poluga's deposition testimony, she indicated that appellee Russ was informed that Rios recanted his story regarding the alleged physical abuse by appellant George Young prior to the first broadcast. The following exchange occurred:
 {¶ 36} "Q. Did you also mention to [appellee] Russ that [Officer Levicki] had found no violations or —
 {¶ 37} "A. Yes.
 {¶ 38} "Q. You told him that?
 {¶ 39} "A. Yes, that he found that what [Rios] had said was not true and that it was in [Officer Levicki's] report. And this was before it ever aired.
 {¶ 40} "Q. I see. Before the newscast ever aired?
 {¶ 41} "A. Before the newscast was ever aired, because I felt really good about the fact that we had some information to offer."
 {¶ 42} Poluga further indicated the following:
 {¶ 43} "Q. Do you think that [the children] outsmarted [appellee] Russ * * *?
 {¶ 44} "A. [Appellee] Russ wanted to believe them.
 {¶ 45} "Q. Why do you think that?
 {¶ 46} "A. I don't think that he was looking for the truth.
 {¶ 47} "Q. What do you base that impression on?
 {¶ 48} "A. I base that impression on the fact that when we had some truth to offer him, he neither wanted it, cared about it, or went after it.
 {¶ 49} "* * *
 {¶ 50} "Q. Do you recall whether or not the broadcast occurred on the same day that you met with Officer Levicki and [appellee] Russ?
 {¶ 51} "A. I don't know if it was the same day, but [the broadcast] was after."[4]
 {¶ 52} Based on the foregoing, the trial court improperly discounted Poluga's testimony that prior to the airing of the first broadcast, she informed appellee Russ that Rios recanted his story, which was corroborated by Detective Levicki's deposition testimony as well as his written report of the interview with Rios. Although appellee Russ received a faxed letter later in the afternoon on February 21, 2002, with respect to the fact that the school district was investigating the allegations regarding appellant George Young, appellee Russ along with the management at appellee WKYC-TV3 discounted Rios's previous recantation and decided to air the story that night. The trial court engaged in a subjective evaluating and weighing of the evidence with respect to Poluga's credibility and reliability. Poluga's deposition testimony was sworn and properly filed in connection with the summary judgment proceedings. The foregoing creates a genuine issue of material fact that appellee Russ was aware that Rios recanted his allegations regarding appellant George Young prior to the first broadcast, which could be a basis for negligent conduct.
 {¶ 53} In addition, it is unclear from the record whether appellee Russ was aware of adult witnesses, namely Karen Davis, regarding the two cafeteria incidents prior to the airing of the broadcasts. Again, however, Poluga testified that appellee Russ wanted to believe the children and opined that he was not looking for the truth. Here, with respect to the summary judgment motions, the trial court improperly determined the credibility of Poluga. See Napier v. Brown (1985),24 Ohio App.3d 12. A genuine issue of material fact exists as to appellee Russ's and appellee WKYC-TV3's alleged negligence. It is our position that the facts of this case, with respect to appellees Russ and WKYC-TV3, raise questions best suited for a jury's determination. Thus, appellants' first assignment of error is with merit.
 {¶ 54} In their second assignment of error, appellants allege that the trial court erred in granting summary judgment in favor of appellee White. Appellants stress that a broadcaster who participates in and delivers part of a defamatory newscast containing false statements is liable.
 {¶ 55} In the instant matter, anchorman appellee White merely introduced the news story at issue. According to appellee White's affidavit, he had no involvement in the origination or investigation of the story. Appellee White indicated that he was not involved in drafting the scripts for the story, nor did he edit, modify or contribute to the scripts in any manner. Appellee White further maintained that he had no involvement in appellee Russ's or appellee WKYC-TV3's decision to pursue and air the broadcasts. As such, appellee White's non-involvement fails to render him liable. See Rogers v. Buckel (1992), 83 Ohio App.3d 653,657-658. Thus, summary judgment was properly granted in appellee White's favor. Therefore, appellants' second assignment of error is without merit.
 {¶ 56} In their third assignment of error, appellants argue that the trial court erred in granting summary judgment to appellee Gannett Co. Appellants maintain that a national media company that owns and operates numerous stations and holds itself out as the owner and operator of a particular station is liable for a defamatory broadcast. Appellants stress that appellee Gannett Co. is liable for the broadcast by its subsidiary, appellee WKYC-TV3.
 {¶ 57} "[P]arent and subsidiary corporations are separate and distinct legal entities * * *." General Motors Corp. v. Limbach (1988),37 Ohio St.3d 271, 273, citing White Motor Corp. v. Kosydar (1977),50 Ohio St.2d 290, 296. Accordingly, a plaintiff can sue a parent corporation for the actions of a subsidiary, and "[t]he corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." Belvedere Condominium UnitsOwners' Assoc. v. R.E. Roark Cos. (1993), 67 Ohio St.3d 274, paragraph three of the syllabus.
 {¶ 58} Here, the record shows that counsel for appellee Gannett Co. provided appellants with ample evidence that appellee WKYC-TV3 is a separately incorporated subsidiary. Appellee Gannett Co.'s representative repeatedly requested that it be voluntarily dismissed by appellants since it had nothing to do with the case. We agree with the trial court that appellants produced no evidence which would have given rise to liability of the part of appellee Gannett Co. In fact, appellants failed to provide any argument or evidence regarding control over the subsidiary in such a manner as to commit fraud or an illegal act, and injury or unjust loss resulting from such control and wrong. See Belvedere, supra, paragraph three of the syllabus. As such, the trial court properly imposed sanctions on appellants and granted appellee Gannett Co.'s motion for summary judgment. Appellants' third assignment of error is without merit.
 {¶ 59} In their fourth assignment of error, appellants contend that the trial court erred by awarding attorney fees to appellee Gannett Co. under R.C. 2323.51 without either a hearing or a motion.
 {¶ 60} R.C. 2323.51(A)(1)(a) provides that frivolous conduct in civil actions means: "the filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action * * * or the taking of any other action in connection with a civil action[.]"
 {¶ 61} R.C. 2323.51(A)(2)(a)(i) and (ii) states that conduct is frivolous if: "[i]t obviously serves merely to harass or maliciously injure another party to the civil action or * * * is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law * * *."
 {¶ 62} R.C. 2323.51(B)(1) indicates that: "any party adversely affected by frivolous conduct may file a motion for an award of * * * attorney's fees * * * incurred in connection with the civil action or appeal."
 {¶ 63} R.C. 2323.51(B)(2) provides that: "[a]n award may be made pursuant to division (B)(1) of this section upon the motion of a party to a civil action or an appeal of the type described in that division or on the court's own initiative, but only after the court does all of the following:
 {¶ 64} "(a) Sets a date for a hearing to be conducted in accordance with division (B)(2)(c) of this section, to determine whether particular conduct was frivolous, to determine, if the conduct was frivolous, whether any party was adversely affected by it, and to determine, if an award is to be made, the amount of that award;
 {¶ 65} "(b) Gives notice of the date of the hearing described in division (B)(2)(a) of this section to each party or counsel of record who allegedly engaged in frivolous conduct and to each party who allegedly was adversely affected by frivolous conduct;
 {¶ 66} "(c) Conducts the hearing described in division (B)(2)(a) of this section in accordance with this division, allows the parties and counsel of record involved to present any relevant evidence at the hearing, including evidence of the type described in division (B)(5) of this section, determines that the conduct involved was frivolous and that a party was adversely affected by it, and then determines the amount of the award to be made. * * *"
 {¶ 67} With respect to motions, Civ.R. 7(B)(1) provides: "[a]n application to the court for an order shall be by motion which, unless made during a hearing or a trial, shall be made in writing. A motion, whether written or oral, shall state with particularity the grounds therefore, and shall set forth the relief or order sought. The requirement of writing is fulfilled if the motion is stated in a written notice of the hearing of the motion."
 {¶ 68} In the case sub judice, again, appellees' counsel contacted appellants' representative numerous times, advising him that appellee Gannett Co. is not a proper party. Appellants' refusal to dismiss appellee Gannett Co. constituted harassment. See R.C. 2323.51(A)(2)(a)(i). Also, as previously addressed in appellants' third assignment of error, because appellee Gannett Co. is not a proper party to this action, appellants engaged in conduct unwarranted by existing law. See R.C.2323.51(A)(2)(a)(ii).
 {¶ 69} However, appellee Gannett Co.'s motion for attorney fees was contained in a footnote in its memorandum in support of its motion for summary judgment, rather than in a proper, formal motion pursuant to Civ.R. 7(B)(1).
 {¶ 70} In addition, with respect to a hearing, the trial court granted appellee Gannett Co.'s motion for attorney fees and stated in its judgment entry that: "[a]n evidentiary hearing to determine the amount of [appellee] Gannett [Co.'s] reasonable attorney fees incurred in preparing its motion for summary judgment and reply memorandum is necessary." The trial court scheduled a future date and time for a hearing which was stayed pending appeal. The trial court erred in granting the motion and awarding attorney fees to appellee Gannett Co. pursuant to R.C. 2323.51
without first conducting a hearing. See Steiner v. Steiner (1993),85 Ohio App.3d 513; Belfiore v. Natl. Eng. Contracting Co. (1991),71 Ohio App.3d 142. Appellants' fourth assignment of error is with merit.
 {¶ 71} For the foregoing reasons, appellants' first and fourth assignments of error have merit, and appellants' second and third assignments of error are not well-taken. The judgment of the Lake County Court of Common Pleas is affirmed in part, reversed in part, and remanded.
Rice, J., concurs, Grendell, J., dissents.
[1] In their answer, appellees stressed that WKYC-TV3 is a separate corporate entity and that Gannett Co. is not a proper party.
[2] In footnote two in its memorandum in support of its motion for summary judgment, appellee Gannett Co. moved for an award of attorney fees incurred in preparing its motion for summary judgment and reply memorandum pursuant to R.C. 2323.51.
[3] Pursuant to its January 27, 2004 judgment entry, the trial court deferred any hearing regarding attorney fees until completion of the instant appeal.
[4] Although a portion of Poluga's deposition testimony was in the nature of opinion, it was part of the record for summary judgment purposes.