JOURNAL ENTRY AND OPINION
{¶ 1} The appellant, Christopher Logan[1], appeals the decision of the trial court in granting the motion for summary judgment of appellee, Birmingham Steel Corporation ("Birmingham") based on Logan's claim of intentional tort. For the reasons set forth below, we reverse the decision of the trial court.
 {¶ 2} Christopher Logan ("Logan") was an employee at Birmingham Steel, located in Cuyahoga Heights, Ohio. In December 1995, he was promoted to a foreman position in the mill, and in July 1996, he was promoted to supervisor of the finishing department. On July 2, 1998, Logan's right leg was crushed by a cycling mast located in the finishing department. Logan was removing a portion of cobbled steel[2] from the bar line equipment at the time of the accident.
 {¶ 3} The bar mill facility began operation in mid-1996. The bar line is several hundred feet long from the steel furnace to the finishing department. The mill is designed to be automated so that the nozzle/tub/mast area does not require worker interaction unless a jam, cobble or some other problem occurs. Most of the equipment in the finishing department is powered electronically and controlled by operator station 16 ("OS16"). The OS16 control panel is located on the second floor of the mill looking down at the bar line. The machinery that is controlled by OS16 can be electronically locked-out at the panel, switched to local/manual mode, or left in automatic mode. When OS16 is locked-out, the operator puts his individual padlock on the control panel, shutting off all electric power to the line. When OS16 is placed in local/manual mode, the operator can control each individual piece of machinery, but the power stays on to the entire line.
 {¶ 4} Cobbled steel was a common occurrence at the bar mill. In order to remove cobbled steel from the nozzle area of the bar line in the finishing department, a worker would have to cut the steel with a torch at the outlet end and at the pivot point of the nozzle. Because the outlet end of the nozzle extends into the pouring reel, the nozzle would then be raised, using the OS16 control panel operated by another employee, to a near horizontal position in order to physically remove the four- to six-foot steel cobble. The nozzle would then be raised all the way to its most upward position so that the coil could be removed from the pouring reel, either by the stationary mast or the overhead crane. Once all the cobbled steel is removed from the line, the system is reautomated.
 {¶ 5} Conflicting testimony exists as to the procedure to follow to remove a cobble from the line. Birmingham claims that the only way to remove cobbled steel from the bar line area is to shut off the power and completely lock out the bar line, remove the cobble, and reactivate the line. Logan and other witnesses who were deposed claim that switching the machinery to manual mode, cutting the cobble, and cycling the equipment in order to remove the coil was the only way they were trained to remove a cobble.
 {¶ 6} The record indicates the bar mill contains two side-by-side nozzles and pouring reels. If the system is "locked out," power to all electrical systems is shut off for both bar mill pouring lines and to all machinery in this area of the mill. There was no written lock-out procedure provided by Birmingham that described how to go about removing cobbled steel if the electrical power to the system was turned off. Locking out one line would cause the second pouring line to become jammed, resulting in a second cobble.
 {¶ 7} According to the record, on July 2, 1998, Logan heard on his radio that steel had cobbled within the nozzle and pouring reel area of the mill. When Logan arrived in that area of the mill, he found William Furguson attempting to remove the cobble. Logan sent Furguson to the OS16 control panel in order to operate the machinery in manual/local mode. Logan lit his torch and began to remove the cobbled steel from the line. When Logan was exiting the line, the stationary mast unexpectedly cycled over the pouring reel knocking him to the ground from behind. Logan was dragged over the pouring reel and his leg was crushed in the 1-1/2 to 3-inch space between the bottom of the mast fingers and the top edge of the reel. The reason for the sudden mast movement has not yet been determined.
 {¶ 8} Logan underwent numerous surgeries in order to salvage his leg. He was subsequently terminated from Birmingham for not following the "general" lockout procedure.
 {¶ 9} On June 30, 1999, Logan filed suit against Birmingham alleging his employer committed an intentional tort against him. On September 5, 2000, Birmingham filed a motion for summary judgment, which was granted by the trial court on October 10, 2001. The trial court held, "* * * this defendant would prevail because, when construed most strongly in plaintiff's favor, the evidence fails to show harm to the employee was substantially certain to occur and fails to establish knowledge on the employer's part that such harm was inevitable."
 {¶ 10} The trial court then submitted an additional journal entry clearing up clerical mistakes found in its original order. The entry stated, "Pursuant to civil rule 60(A) this court's JE signed 10/11/01, granting defendant's motion for summary judgment is corrected to reflect that the court read and considered all depositions filed by all parties not just those of moving defendant as full opinion stated."
 {¶ 11} On November 7, 2001, Logan filed the instant appeal, which was stayed by this court due to the pendency of a bankruptcy action filed by Birmingham. On May 14, 2003, Logan filed notice of relief from bankruptcy, and this court removed the stay.
 {¶ 12} The appellant puts forth the following assignment of error:
 {¶ 13} "The Trial Court Erred When It Granted Summary Judgment To Appellee Birmingham Steel Corporation."
 {¶ 14} Civ.R. 56 provides that summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. Norris v.Ohio Std. Oil Co. (1982), 70 Ohio App.2d 1; Temple v. Wean United, Inc.
(1977), 50 Ohio St.2d 317.
 {¶ 15} It is well established that the party seeking summary judgment bears the burden of demonstrating that no issues of material fact exist for trial. Celotex Corp. v. Catrett (1987), 477 U.S. 317,330; Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, 115. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356. This burden must be satisfied by specifically producing evidence contained within the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations, which demonstrate the non-moving party's lack of support toward his claims. Dresher v. Burt (1996),75 Ohio St.3d 280.
 {¶ 16} In Dresher, the Ohio Supreme Court modified and/or clarified the summary judgment standard as applied in Wing v. AnchorMedina, Ltd. of Texas (1991), 59 Ohio St.3d 108. Under Dresher, "* * * the moving party bears the initial responsibility of informing the trial court of the basis for the motion and identifying those portions of the record which demonstrate the absence of a genuine issue of fact or material element of the nonmoving party's claim." Id. at 296.
 {¶ 17} The nonmoving party has a reciprocal burden of specificity and cannot rest on mere allegations or denials in the pleadings. Id. at 293. The nonmoving party must set forth "specific facts" by the means listed in Civ.R. 56(C) showing a genuine issue for trial exists. Id.
 {¶ 18} This court reviews the lower court's granting of summary judgment de novo. Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704. An appellate court reviewing the grant of summary judgment must follow the standards set forth in Civ.R. 56(C). "The reviewing court evaluates the record * * * in a light most favorable to the nonmoving party * * *. [T]he motion must be overruled if reasonable minds could find for the party opposing the motion." Saunders v. McFaul
(1990), 71 Ohio App.3d 46, 50; Link v. Leadworks Corp. (1992),79 Ohio App.3d 735, 741.
 {¶ 19} "An intentional tort is an action committed with the intent to injure another, or committed with the belief that such injury is substantially likely to occur." Hannah v. Dayton Power Light Co.
(1998), 82 Ohio St.3d 482, 484. Therefore, in order to overcome an employer's motion for summary judgment on an intentional tort claim, the plaintiff must set forth facts showing that there is a genuine issue as to whether the employer committed an intentional tort. Fyffe v. Jeno's,Inc. (1991), 59 Ohio St.3d 115. In Fyffe, the Ohio Supreme Court set forth the following test:
 {¶ 20} "In order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated:
 {¶ 21} "(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation;
 {¶ 22} "(2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and
 {¶ 23} "(3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at 118.
 {¶ 24} Proof to establish the three elements necessary for the intentional tort may be made by direct and or indirect circumstantial evidence. Hanna, supra. The three prongs of the Fyffe test are questions of fact. Maples v. Columbus Zoological Park Assoc. (1993),91 Ohio App.3d 133.
 {¶ 25} The Ohio Supreme Court further elaborated on what constitutes intent, "To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Fyffe, supra at 118.
 {¶ 26} "Thus, while desire to cause consequences is imputed, actual knowledge that consequences are substantially certain is required." New Hampshire Insurance Group v. Frost (1995),110 Ohio App.3d 514, 517, citing Howard v. Columbus Prod. Co. (1992),82 Ohio App.3d 129, 134-135.
 {¶ 27} For the purposes of intentional tort liability, an employer's failure to comply with safety regulations is a relevant consideration in determining the employer's knowledge of substantial certainty of injury. Anderson v. Zavarella Bros. Constr. Co. (Dec. 5, 1996), Cuyahoga App. No. 70657, at 5.
 {¶ 28} In order to fulfill the first factor of the Fyffe test, the appellant must establish that his employer possessed the knowledge of the existence of a dangerous process, procedure, instrumentality or condition within its business operation.
 {¶ 29} Charles T. Valore, the general supervisor of rolling, was responsible for the day-to-day operations of the mill. Michael Blake was the operations manager; he was responsible for the general operation of this mill and a few other mills owned by Birmingham. Valore reported to Blake, and Logan reported to Valore. In the depositions of Valore and Blake, it is apparent that both men thought the nozzle/pouring reel/mast area of the mill was dangerous if the machinery was not electrically locked out in order to remove a cobble. Blake stated that the machinery is very dangerous, even in manual mode. Valore stated he knew that someone could be seriously hurt or killed if the machinery was not locked out.
 {¶ 30} Both men denied ever having been present or having knowledge of a cobble being removed with the machinery in manual mode and not locked out; however, this testimony is directly contradicted by the testimony of Allan Angiocchi, Edward Bennett, John Figueroa, and Chris Georgas, employees of Birmingham, who each stated they saw either Valore or Blake present at least one time when a cobble was being removed while the system was in manual mode without the machines being locked out.
 {¶ 31} Furthermore, the testimony of Birmingham employees, David Atkin, Chris Logan, Allan Angiocchi, Edward Bennett, William Ferguson, Robert Dugan, John Figueroa, and Chris Georgas directly contradicts the stance which Birmingham has taken that all machines that cycle must be locked out before removing a cobble. Their testimony states that putting the machine in manual mode, not locking out, and jogging the machine was the way they were trained by fellow employees to remove cobbles.
 {¶ 32} Therefore, appellant has presented sufficient evidence to overcome a motion for summary judgment as to the first element of theFyffe test. The testimony presented indicates that Birmingham might be aware, through its agent supervisors, that its employees were being trained to walk into the nozzle/pouring reel/mast area of the mill without the system being locked out. Furthermore, the testimony of Valore and Blake indicates that both men thought this area was dangerous if the machinery was not locked out.
 {¶ 33} In order to fulfill the second factor of the Fyffe test, the appellant must establish that the employer possessed knowledge that if an employee is subjected by his employment to such a dangerous process or procedure, then harm to the employee would be substantially certain to occur.
 {¶ 34} Birmingham contends they had no knowledge that the appellant would enter the nozzle/pouring reel/mast area of the mill without complying with the mandatory lockout procedure; therefore, they could not have known with substantial certainty that the appellant would have been injured. Birmingham also asserts that there were no other accidents involving this area which would allow them to be charged with any knowledge that an injury to an employee was substantially certain to occur.
 {¶ 35} The deposition testimony noted above establishes the fact that the supervisors at Birmingham could have known that their employees were entering a dangerous area of the mill without locking out the machinery. With this knowledge, the management failed to correct the actions of their employees until an injury occurred.
 {¶ 36} The testimony of David Atkins, the electrical supervisor, indicates the mast that injured Logan malfunctioned at least five times in the past. Edward Bennett indicated he was almost injured when the mast unexpectedly moved toward him in manual mode while he was removing a coil. Chris Georgas also testified that the mast unexpectedly cycled in manual mode, almost striking a fellow employee, Ron Henley. Furthermore, Birmingham was violating OSHA regulations by either not enforcing, properly training, or disciplining employees on proper ways to lock out machinery that may cycle and injure employees. These are all factors to be considered in determining if the injury to Logan was substantially certain to occur.
 {¶ 37} While there was no evidence presented of previous accidents involving the stationary mast, the lack of prior accidents is not dispositive. This court has previously held in Brown v. Packaging Corp.of America (Jan. 11, 2001), Cuyahoga App. No. 77709:
 {¶ 38} "Simply because people are not injured, maimed, or killed every time they encounter a device or procedure is not solely determinative of the question of whether that procedure or device is dangerous and unsafe. If we were to accept the [employers's] reasoning, it would be tantamount to giving every employer one free injury for every decision, procedure or device it decided to use, regardless of the knowledge or substantial certainty of the danger that the employer's decision entailed. This is not the purpose of Fyffe. It is not incumbent that a person be burned before one knows how to play with fire." Cook v.Cleveland Elec. Illuminating Co. (1995), 102 Ohio App.3d 417, 429-430,657 N.E.2d 356; See, also, Taulbee v. Adience, Inc. BMI Div. (1997),120 Ohio App.3d 11, 19-20, 696 N.E.2d 625. * * * Thus, in determining whether an employer had knowledge that a dangerous procedure would be substantially certain to cause injury, the focus is not how many prior accidents had occurred, but rather on the employer's knowledge of the degree of risk involved. Taulbee, 120 Ohio App.3d at 21."
 {¶ 39} In the instant matter, there is deposition testimony that any time the maintenance or service departments would work on the mill, the machines were locked out and tested again for any movement to make sure the systems were shut down. These safeguards were put into place to avoid serious injuries to employees who were working on machines that could cycle. There was a written lock-out procedure for the maintenance and servicing of the mill.
 {¶ 40} Removing cobbles was considered to be an operational task, done by the operators of the mill, while the mill was in production. According to deposition testimony, cobbles form in the mill with relative frequency. At the time of the appellant's injury, there was no written procedure set forth by the management concerning how to remove a cobble. Also, there was no written lock-out procedure for this area of the mill as existed for other areas of the mill, such as the cutting shears. The fact that employees must remove cobbles from the mill in an unsafe way, added to the fact that cobbles occurred so frequently, is another factor to consider for substantial certainty that harm would occur.
 {¶ 41} The testimony of David Atkins and other employees of Birmingham indicates that they were "criticized and chastised for delays in the mill." (Atkins Depo. p. 32). The main focus of the mill was production. Employees were encouraged and awarded to meet the steel production goals set forth by the management. Deposition testimony further indicates that properly locking out the mill in this area would cause a greater delay in removing cobbles from the mill. Reasonable minds may find that Birmingham failed to enforce a lock-out procedure in order to avoid delays and increase production, while also increasing the risk of harm to its employees.
 {¶ 42} The appellant has presented testimony that Birmingham may have been training its employees to enter the nozzle/pouring reel/mast area to remove cobbled steel by placing the machinery in manual mode. Appellant has also shown that the management of Birmingham should have known of this practice and did nothing about it. Furthermore, reasonable minds could conclude that the risk of harm to the appellant was substantially certain to occur given the testimony of Valore and Blake about how dangerous this area of the mill was if not locked out.
 {¶ 43} Finally, the third factor of Fyffe requires the appellant to show that the employer, under such circumstances and with such knowledge, did act to require the employee to continue to perform the dangerous task.
 {¶ 44} Deposition testimony expressly states the job of removing cobbles was left to the operators, which include the appellant and workers under him who operate the finishing department of the mill. Appellant and other workers in the mill testified that putting the mast and pouring reels in manual mode, cutting the cobble, and jogging the machinery was the only way they were trained to remove cobbles. Locking out the OS16 control box was not considered when removing a cobble. By directing an employee to physically enter this area of the mill, in the manner in which he was allegedly trained to perform this task, the third prong of the Fyffe test is satisfied for the purposes of opposing a motion for summary judgment.
 {¶ 45} When construing all facts within the record and the inferences that arise therefrom most strongly in favor of the appellant, this court concludes that reasonable minds could conclude that Birmingham was aware of employees not locking out dangerous machinery before removing cobbles, that this activity was a dangerous procedure for which the risk of injury was substantially likely to occur, and that employees were required to complete this dangerous task. The appellant has set forth facts showing that there is a genuine issue as to whether the employer committed an intentional tort; therefore, the trial court's grant of summary judgment in favor of Birmingham was inappropriate.
Judgment reversed and remanded.
KENNETH A. ROCCO, A.J., AND SEAN C. GALLAGHER, J., CONCUR.
[1] Joshua and Zachary Logan are the natural minor children of Christopher Logan and also brought an action for loss of consortium.
[2] A cobble occurs when the steel stops flowing through the line. It requires workers to physically remove the cobble from the bar line using a torch and crane.