OPINION
{¶ 1} Appellants, Karen Hunt ("Hunt") and Irene Hargrave ("Hargrave"), appeal from the February 22, 2005 judgment entry of the Trumbull County Court of Common Pleas, granting the motion for summary judgment of appellee, Trumbull Community Action Program.
 {¶ 2} On November 5, 2003, appellants filed a complaint for damages against appellee, alleging age discrimination, wrongful discharge in violation of public policy and intentional infliction of emotional distress. Appellee answered on December 8, 2003. Discovery was conducted, after which, on August 20, 2003, appellee filed its first motion for summary judgment. On August 25, 2003, appellants amended their original complaint to add claims of reverse race discrimination, breach of implied contract or promissory estoppel and negligence. On December 14, 2003, appellee filed its amended motion for summary judgment, maintaining, inter alia, that appellants' positions were eliminated due to a reduction in the work force. Appellants filed their response in opposition to appellee's motion for summary judgment on January 7, 2005, limiting their opposition to claims regarding reverse race discrimination and breach of implied contract, to which appellee replied on January 13, 2005.
 {¶ 3} In their amended complaint, appellants allege that they are Caucasian, were employed by appellee, Hargrave as a family advocate and Hunt as a lead teacher, and that in August 2003, they were "perfunctorily terminated from employment" due to their race. They maintain that they encountered repeated instances of reverse discrimination from African American management due to their Caucasian race.
 {¶ 4} Specifically, Hunt claims that she was a lead teacher for four years. She asserts that her supervisor publicly humiliated her in the women's restroom when an African American assistant teacher complained about her, when such conferences were normally confidential. She alleges that management also required her to preface her requests to this same African American assistant as, "[i]f you would like to do this[.]" Hunt further contends that management never took time to listen to her complaints like they did African American assistant teachers and bus aides, noon aides ("BANAs"). She alleges that she, a lead teacher with two degrees and state licensure, was made to exchange places with an African American BANA as punishment when the BANA complained about her to management. Moreover, Hunt asserts that she was reprimanded for not washing her hands when an African American family advocate told on her and that this was just another example of how management treated her disparately. Furthermore, she claims that management terminated her lunch and ordered her to clean up her classroom after one of her students got sick, telling her "[d]o you really need a lunch?"
 {¶ 5} Hargrave states that she was a family advocate for ten years. She insists that there were repeated incidents when management refused to listen to her complaints, and that they did not treat African American employees similarly. She complains that management made racially motivated comments to her, calling a fly on the wall a Caucasian fly and asking her "[i]s it true that white people don't wear underwear[?]" In an affidavit filed after appellee's summary judgment motion, she also averred that one of her African American supervisors told her that she did not believe that it was right that she had biracial children. Hargrave further contends that she was not permitted to take bereavement time when her brother was murdered, time she was entitled to, and that African American employees were permitted to do so. Moreover, she asserts that she was not permitted to seek medical treatment when other African American employees were permitted to do so.
 {¶ 6} On February 22, 2005, the trial court, after finding that, "[appellants have] responded [to appellee's motion for summary judgment,] but only to claims regarding [r]everse [r]ace [d]iscrimination and [b]reach of [i]mplied [c]ontract[,]" dismissed appellants' claims of age discrimination, wrongful discharge in violation of public policy, negligence, and intentional infliction of emotional distress. After analyzing the remaining claims of breach of implied contract and reverse race discrimination, the trial court stated: "[t]he [c]ourt finds that there are no genuine issues as to any material facts and after construing the evidence most strongly in favor of [appellants], reasonable minds could come to but one conclusion and that conclusion is adverse to [appellants]. It is therefore ordered that [appellee] be in and is herein granted summary judgment and the case is dismissed at [appellants'] costs."
 {¶ 7} It is from that judgment that appellants filed a timely notice of appeal and raise the following sole assignment of error:
 {¶ 8} "The trial court erred to the prejudice of [appellants] in granting [appellee's] motion for summary judgment with the statement that `in this case [appellants have] not presented further direct circumstantial or statistical evidence that race was a factor in this case.'"
 {¶ 9} In order for a summary judgment to be granted, the moving party must prove that, "(1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." Mootispawv. Eckstein (1996), 76 Ohio St.3d 383, 385. If reasonable minds could find for the party opposing the motion for summary judgment, then the motion must be denied. Link v. LeadworksCorp. (1992), 79 Ohio App.3d 735, 741.
 {¶ 10} In Dresher v. Burt (1996), 75 Ohio St.3d 280, the Supreme Court of Ohio set forth the standard for summary judgment, specifically outlining each party's burden under Civ.R. 56. First, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Id. at 292. The portions of the record include those evidentiary materials listed in Civ.R. 56(C), such as "`the pleading[s], depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence * * * and written stipulations of fact, if any.'" Id. at 293.
 {¶ 11} Then, "[i]f the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in * * * Civ.R. 56(E), which provides that:
 {¶ 12} "`* * * [the nonmoving party] must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.'" Id.
 {¶ 13} Appellate courts review a trial court's granting of summary judgment de novo. Brown v. Cty. Commrs. of Scioto Cty.
(1993), 87 Ohio App.3d 704, 711. The Brown court stated that, "we review the judgment independently and without deference to the trial court's determination." Id. Thus, in determining whether a trial court properly granted a summary judgment motion, an appellate court must review the evidence in accordance with the standard set forth in Civ.R. 56, and as such, must evaluate the record "in a light most favorable to the nonmoving party."Link, supra, at 741.
 {¶ 14} Before we address appellants' sole assignment of error, we note that since this was a summary judgment motion, the trial court improperly dismissed appellants' claims of age discrimination, wrongful discharge in violation of public policy, negligence, and intentional infliction of emotional distress. After doing so, the trial court went on to analyze the remaining two claims, and found "that there are no genuine issues as to any material facts and after construing the evidence most strongly in favor of [appellants], reasonable minds could come to but one conclusion and that conclusion is adverse to [appellants]." Subsequent to that finding, the trial court then "granted summary judgment" for appellee. However, after granting summary judgment, it improperly stated that, "the case is dismissed at [appellants'] costs." We note that when summary judgment is entered in favor of a party, the case is not also contemporaneously and coextensively "dismissed."
 {¶ 15} Since an appellate court stands in the shoes of the trial court when reviewing motions for summary judgment, we can determine whether to affirm or reverse the trial court's decision on all of appellants' claims. Accordingly, we conclude that there is no genuine issue as to any material fact with respect to any of appellants' claims.
 {¶ 16} First, we will address appellants' claims of age discrimination, wrongful discharge in violation of public policy, negligence, and intentional infliction of emotional distress. Although the trial court erred when it improperly "dismissed" these claims, for the reasons that follow, we conclude that it was not prejudicial error. After reviewing the record de novo, we conclude that there was no genuine issue of material fact to these four claims.
 {¶ 17} Appellee met its initial burden in its motion for summary judgment on all six of appellants' claims, setting forth the basis for the motion, and identifying those portions of the record which demonstrated the absence of a genuine issue of material fact on the essential elements of appellants' claims. Appellants filed a response to appellee's motion, however, they limited the response to their claims of breach of implied contract and reverse race discrimination.
 {¶ 18} The Supreme Court of Ohio made it very clear, that pursuant to Civ.R. 56(E), if the moving party has satisfied its initial burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. Dresher, supra, at 293. Thus, we conclude that summary judgment is appropriate on these four claims.
 {¶ 19} With respect to appellants' claim of breach of implied contract, appellant did respond to appellee's motion for summary judgment. Furthermore, the trial court properly reviewed this claim and granted summary judgment on it, albeit improperly following it with words of dismissal. However, appellants failed to properly assign, or argue this as error in their brief to this court, as required by App.R. 16. Basically, with respect to this issue, appellants failed to meet any of the requirements of App.R. 16. In the context of evaluating the consequences of a litigants failure to comply with App.R. 16, we have held that "it `would be manifestly unfair to the opposing parties' for this court to step into the role of advocate for a party and to do the work the party should itself have done." McGrath v. Mgt. Training Corp. (Dec. 14, 2001), 11th Dist. No. 2001-A-0014, 2001 Ohio App. LEXIS 5643, at 6. Thus, we affirm the trial court's granting of summary judgment on this claim.
 {¶ 20} Now, we will address appellants' remaining claim of reverse race discrimination. Appellants posit one issue for review, contending that in an action for damages predicated on reverse race discrimination, allegations of direct discrimination and disparate treatment prior to the discharge are "actionable in and of themselves as to a discriminatory hostile work environment[,]" as well as "to be considered as evidentiary as to the discharge itself." Appellants maintain that the trial court erred when it noted that appellants alleged a course of conduct, but then granted summary judgment because appellants did not proffer any further direct circumstantial evidence or statistical evidence that race was a factor in this case.
 {¶ 21} Appellants brought their claim of reverse race discrimination pursuant to Ohio civil rights law, which is set forth in Chapter 41 of the Ohio Revised Code. The Ohio Supreme Court has held, however, that discrimination cases brought in state courts should be construed and decided in accordance with federal guidelines and requirements. Barker v. Scovill, Inc.
(1983), 6 Ohio St.3d 146, 147.
 {¶ 22} The applicable discrimination provision in employment under the Ohio Civil Rights Act is set forth in R.C. 4112.02(A), which provides that, "[i]t shall be an unlawful discriminatory practice * * * [f]or any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 23} Because discrimination is seldom evidenced by overt actions or direct evidence, an employee may raise a presumption of discrimination by using circumstantial evidence in order to establish a prima facie case of discrimination. In McDonnellDouglas Corp. v. Green (1973), 411 U.S. 792, the Supreme Court of the United States established the analytical framework for proving discrimination cases through circumstantial evidence.Hagan v. Warner/Elektra/Atlantic Corp. (C.A. 6, 2004), 92 Fed. Appx. 264, 267. This framework was adopted by the Ohio Supreme Court in Plumbers Steamfitters Commt. v. Ohio Civil RightsComm. (1981), 66 Ohio St.2d 192. Barker, supra, at 147;Kohmescher v. Kroger Co. (1991), 61 Ohio St.3d 501, 504.
 {¶ 24} Under this basic framework, in order to establish a prima facie case of discrimination, employees must show that (1) they were a member of a statutorily-protected class; (2) they were discharged (3) they were qualified for the position; and (4) they were replaced by a person who did not belong to the protected class. Barker, supra, paragraph one of the syllabus.
 {¶ 25} If the plaintiff establishes a prima facie case, then the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's discharge. Id. at 148. However, the employer need not persuade the court that it was actually motivated by the proffered reasons; i.e., it is only a burden of production. Taylor v. Union Inst. (C.A.6, 2002), 30 Fed. Appx. 443, 448. This is because "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the [employee] remains at all times with the [employee]." Texas Dept. of Community Affairs v. Burdine
(1981), 450 U.S. 248, 253. To meet this burden of production, the employer "must clearly set forth, through the introduction of admissible evidence, the [permissible] reasons for the [employee's] rejection." Id. at 255.
 {¶ 26} Finally, if the employer advances legally sufficient grounds for the action, then the burden shifts back to the employee to show by a preponderance of the evidence that the reasons articulated by the employer were merely a pretext for unlawful discrimination. Barker, supra, at 148. The employee "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, supra, at 256. Thus, if an employee fails to set forth facts that establish a prima facie case of employment discrimination or to issue the evidentiary rejoinder to the asserted lawful basis for the adverse employment action, then the employee's claim must fail.
 {¶ 27} Courts have modified the basic McDonnellDouglas/Burdine framework in order to address various types of discrimination. In a reduction-in-force case, the employer does not replace the employee, thus an employee carries a greater burden of establishing a prima facie case of discrimination with respect to the fourth requirement. Mack v. BF Goodrich Co.
(1997), 121 Ohio App.3d 99, 101. "Where a company is reorganizing or reducing its work force, a[n employee] must present `additional direct, circumstantial, or statistical evidence that [the discriminatory reason] was a factor in the termination in order to establish a prima facie case.'" Karaba v. AlltelCommunications, Inc., 8th Dist. No. 80546, 2002-Ohio-4583, at ¶ 13, citing Ridenour v. Lawson Co. (C.A.6 1986), 791 F.2d 52, 57. An employee can meet this greater burden by showing that others not in the protected class were treated more favorably.Taylor, supra, at 447, citing Williams v. WilliamsElectronics, Inc. (C.A.7, 1988), 856 F.2d 920, 922-23. Furthermore, in a reduction-in-force case, the employer, in order to meet its burden, must also show why it chose the employee alleging discrimination as the object of the reduction-in-force, as opposed to someone else. Taylor at 448.
 {¶ 28} In the case sub judice, we conclude that summary judgment in favor of appellee was appropriate. First, appellants failed to establish a prima facie case of reverse race discrimination. As in most cases, the evidence shows that there is no direct evidence that appellants were discharged due to discrimination. It is undisputed that appellee did not make any statements, involved in the decision to eliminate appellants'positions, that were in any way related to appellants' race.
 {¶ 29} Furthermore, upon analyzing appellants' cases under the McDonnell Douglas/Burdine framework, it is equally clear that they did not establish a presumption, ergo a prima facie case, of discrimination. The facts show that appellants can meet the first three requirements under the framework. First, as Caucasians, they are clearly members of a protected class.McDonald v. Santa Fe Trail Transp. Co. (1976), 427 U.S. 273,296. With regard to the second requirement, appellee informed appellants that it was not going to renew their contracts for the 2003-2004 school year because their positions had been eliminated. And finally, although appellee took appellants' poor performance evaluations into consideration when it was deciding whose positions it was going to eliminate, there was no evidence that appellants were not qualified for their jobs.
 {¶ 30} The problem appellants have in establishing their prima facie cases is meeting the fourth prong of the analysis as modified in a reduction-in-force case. A review of the record before us reveals that appellants have not provided "additional direct, circumstantial, or statistical evidence" of discrimination showing that others not in the protected class were treated more favorably. Taylor, supra, at 447; Ridenour,
supra, at 57. Looking at the facts, in a light most favorable to appellants, reveals that neither appellant has provided sufficient evidence to establish this prong of a prima facie case of discrimination in a reduction-in-force situation.
 {¶ 31} Hunt maintains that her supervisor never listened to her, yet treated African American employees more favorably by listening to their complaints about her. However, Hunt admitted in her deposition that after she complained to her Caucasian supervisor about one of her African American assistant teachers, the African American assistant was subsequently fired.
 {¶ 32} Hunt made several allegations that African Americans were treated more favorably than she was, but when asked in her deposition why she believed the action was related to race, gave vague and elusive answers. For example, Hunt's supervisor, who was Caucasian, made her exchange job duties with an African American BANA. Hunt had to ride the bus with the students while the BANA taught her class. Hunt claims that this punishment was racially motivated. When asked why she believed so, she replied "[w]as there any other African American that was called up to say you need to ride the bus because a Caucasian came to complain about you? No." But then when asked if she knew that to be true, admitted that she did not know "all the workings of the administration[.]"
 {¶ 33} Hunt further complained that appellee singled her out and picked on her for not washing her hands after an African American family advocate saw her leave the restroom without washing her hands. When asked in her deposition why she believed it was race related, stated, "I'm Caucasian and she's African American. They wanted to pick on me." Hunt claims in her appellate brief that appellee "set forth a litany of racially discriminatory and oppressive workplace[,]" towards Caucasians, yet maintains in her deposition that she was the only one "picked on."
 {¶ 34} Hunt also alleged that she was made to return to work early during her lunch break in order to clean her classroom after one of her students got sick. When asked in her deposition why she believed this was race related, she stated that "[n]o other African American had to do that." However, she admitted upon further questioning that there were only two people who could have cleaned it up, either she or her Caucasian BANA who was in her classroom that day. Thus, her supervisor chose her, a Caucasian teacher, to clean it up, rather than her Caucasian BANA.
 {¶ 35} As for Hargrave, she alleged that three comments were made to her that were evidence of direct discrimination. She alleged that an African American colleague stated that, "this fly is getting on my nerves, it must be Caucasian." However, she admitted in her deposition that the person who stated it was not her supervisor at that time and that the incident occurred in "1996 or 1997," seven years prior to her discharge. Moreover, she admitted that after she reported the incident to management, the co-worker never made another similar comment. Hargrave further complained that during another incident, two African American office mates, asked her if it was true that white people did not wear underwear. However, she admitted that at that time, neither office mate was directly involved in any of her evaluations and that the alleged incident took place in "1994 or 1995," eight or nine years prior to her discharge.
 {¶ 36} Finally, in her affidavit supporting her opposition response to appellee's amended motion for summary judgment, Hargrave averred that her African American supervisor made a comment that she did not feel it was right that Hargrave was white and had biracial children. However, she failed to identify this incident in her deposition when asked if there were any other incidents that support her claim against appellee.
 {¶ 37} These comments do not rise to the level necessary in order to create a prima facie case of discrimination. It is well established that stray comments do not constitute direct discrimination. Smith v. Leggett Wire Co. (C.A.6, 2000),220 F.3d 752, 760. In order to rise to the level of direct evidence, isolated comments "must be contemporaneous with the discharge or causally related to the discharge making process." Geier v.Medtronic Inc. (C.A.7, 1996), 99 F.3d 238, 242. Moreover, an isolated discriminatory remark made by someone with no managerial authority over the challenged personnel decision is not considered indicative of discrimination. Smith, supra, at 760;Ercegovich v. Goodyear Tire Rubber Co. (C.A. 6, 1998),154 F.3d 344, 354. Thus, three isolated racial comments, made over a period of ten years and not made contemporaneously to Hargrave's discharge, is not direct evidence of discrimination.
 {¶ 38} Hargrave makes other allegations that African Americans were treated more favorably than she was. However, Hargrave does not submit material evidence to support her contention that these actions were race related. For example, she claims that African American family advocates were permitted to attend seminars and she, a Caucasian, was "never allowed to go." However, she later admitted that, in fact, appellee had sent her to Kent State for three semesters in order to obtain her certification. In another example, Hargrave alleges that she was not allowed to take medical leave when she had an abscess tooth, however, she in no way relates this claim to her race.
 {¶ 39} Finally, Hargrave maintains that she was not permitted to take the allotted three days of bereavement leave when her brother was murdered, claiming that an African American co-worker was permitted to do so. However, she failed to present any evidence that the alleged co-worker had actually taken bereavement leave and not some other kind of leave. Furthermore, in her deposition, Hargrave admits that she had not seen her brother in at least fifteen to twenty years, that her brother's death had actually occurred over two weeks prior to her request for leave, and that she had already been off for one week prior to her request due to an auto accident. Appellee permitted Hargrave to take one day of bereavement leave for her brother's funeral, it simply did not permit her to take the three days normally permitted for immediate family members. In light of the fact that she had not seen her brother in fifteen to twenty years, appellee's actions do not rise to the crest of being unreasonable or discriminatory.
 {¶ 40} Thus, after reviewing the facts in a light most favorable to appellants, we conclude that appellants failed to establish a prima facie case of discrimination. As such, summary judgment is warranted.
 {¶ 41} Even if we had determined that appellants had established a prima facie case of discrimination, summary judgment would still be warranted because appellants did not present an evidentiary rejoinder showing that appellee's nondiscriminatory reason for their discharge was a mere pretext for discrimination. In their appellate brief, appellants did not respond — at all — to appellee's nondiscriminatory reason for appellants' discharge. In fact, appellants fail to put forth any argument that the reason articulated by appellee was a mere pretext for discrimination, nor do they respond to appellee's sound, statistical evidence showing why appellants were chosen as employees not called back for the 2003-2004 school year.
 {¶ 42} The facts before us reveal that appellee met its burden of production in articulating a legitimate, non-discriminatory reason for appellants' discharges. Head Start funding was cut substantially at the end of the 2002-2003 school year. Appellants admitted knowing that funding to Head Start could be cut. Appellee asserts that it was forced to eliminate not only appellants' positions, but twenty-nine other employees, including five lead teachers and two family advocates. It is well settled that a budget shortfall is a legitimate, nondiscriminatory reason to reduce work force, if the employer shows additional evidence why the reduction-in-force happened to the employee. Taylor, supra, at 448, citing Burdine, supra, at 254. Appellee met this additional requirement as well. Appellee proffered that in determining what employees not to recall, it considered employee evaluations for the previous two years. Appellee chose not to recall employees with the lowest evaluations. In the case at bar, both appellants had some of the lowest evaluation scores, as well as a history of progressive discipline, including suspensions.
 {¶ 43} As for Hargrave, she had the lowest evaluation scores in the previous two years than any other family advocate. In 2002, Hargrave's evaluation score was sixty-six, while the next closest was seventy-two. In 2003, Hargrave's evaluation score was forty-six, while the next closest was sixty. Furthermore, appellee proffered that five of the family advocates recalled were white.
 {¶ 44} With respect to Hunt, five lead teachers were not recalled, two were due to attrition. Of the remaining three, two were Caucasian and one was African American. Twenty-nine teachers that were recalled in 2003 were Caucasian. Appellee's vice-president averred that these three teachers were chosen because they had the lowest evaluation scores.
 {¶ 45} Neither appellant offers any evidence that they did not have one of the lowest evaluation scores. Nor does either appellant offer any evidence that their low evaluations were racially motivated. Although Hunt presented evidence that an African American complained about her, there was no evidence that these complaints were racially motivated, except for the fact that the complainants were themselves African American. In addition, Hunt's supervisor during these incidents was Caucasian. It is the responsibility of courts to determine whether the proffered business judgment related to performance considerations was "genuinely and honestly made." Williams, supra, at 924. We conclude here that appellee's proffered reasons were made so.
 {¶ 46} Furthermore, appellee proffered evidence that from 2003 to 2004, the percentage of Caucasian employees actually rose from sixty-one percent to sixty-seven percent, while the percentage of African American employees declined from thirty-eight percent to thirty-two percent. The majority of Caucasian employees were retained when Hunt and Hargrove were not called back.
 {¶ 47} Moreover, appellants proffered no evidentiary rejoinder to the fact averred by appellee that appellants were not called back because they had the lowest evaluation scores. Hunt even admitted in her deposition that she "expected [her layoff] was because of [her] evaluation[.]"
 {¶ 48} Appellants neither showed that the nondiscriminatory reason for their discharge was false, nor showed that the real motivation was race. Therefore, appellee is entitled to judgment as a matter of law.
 {¶ 49} Although appellants fail to raise it in any of their pleadings, sworn statements, or testimony, they allege in their appellate brief that appellee's "course of conduct" entitled them to proceed at the trial court level since a discriminatory hostile work environment is actionable in and of itself. Although appellants did not raise this claim at the trial court level or direct us to the proper authority, they are correct that a hostile work environment is an actionable claim. Harris v.Forklift System, Inc. (1993), 510 U.S. 17, 21. However, even if appellants had properly raised this issue, they would not have established the elements necessary to survive summary judgment on a hostile work environment claim.
 {¶ 50} "To establish a claim brought under R.C. Chapter 4112 against an employer for a hostile work environment created by racial harassment, [an employee] must establish: (1) the employee was a member of the protected class; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon race; (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment; and (5) the existence of respondeat superior
liability." Zacchaeus v. Mt. Carmel Health Sys. (Feb. 5, 2002), 8th Dist. No. 01AP-683, 2002 Ohio App. LEXIS 398, at 6. (Emphasis sic.)
 {¶ 51} The facts established in the case at bar, and summarized in the foregoing analysis, show that appellee's conduct would not rise to the level necessary to establish that appellants were subjected to a racially hostile work environment. First, we have already determined that besides the few comments directly related to race, appellants have not established that the conduct complained of was actually based upon the fact that they are Caucasian. Moreover, the comments that were directly related to race were infrequent, only occurring three times over a period of ten years. This would not rise to the level of conduct prohibited by Title VII.
 {¶ 52} In Harris, supra, the United States Supreme Court gave some guidance to lower courts in determining whether an environment is hostile or abusive. Courts must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 22.
 {¶ 53} In the case sub judice, looking at the totality of the circumstances, there is no hostile environment. Rather than putting forth a string of dreadful adjectives, appellants should have put forth material facts to support their claim in order for it to survive summary judgment. They failed to do so.
 {¶ 54} Therefore, we conclude that appellants' sole assignment of error is not well-taken. We further conclude that the judgment of the Trumbull County Court of Common Pleas is affirmed on all causes of action set forth by appellants.
O'Neill, J., Grendell, J., concur.